United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARY BULL, et al.,

            Plaintiffs,

   v.

CITY & COUNTY OF SAN FRANCISCO, et al.,

            Defendants.
_____/

No. C 03-01840 CRB

**MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

     In this class action, plaintiffs challenge the former policy of the City and County of San Francisco ("CCSF") of performing strip searches on certain classes of pre-arraignment detainees at CCSF's jails.  Now before the Court is a motion by plaintiffs for partial summary judgment regarding several of their strip search claims under federal and state law. After carefully reviewing the memoranda and evidentiary record submitted by the parties, and having had the benefit of a lengthy oral argument, the Court hereby GRANTS IN PART and DENIES IN PART plaintiffs' motion for summary judgment.

     Defendant Michael Hennessey has also filed a motion for summary judgment regarding qualified immunity.  That motion is GRANTED IN PART AND DENIED IN PART.  Finally, defendants renew their earlier motion for summary judgment with respect to plaintiffs Zern and Corneau.  That motion is GRANTED.

United States District Court

For the Northern District of California

# BACKGROUND

## I.  Factual History

The San Francisco Sheriff's Department ("the Department") oversees six county jails. After arrest, all arrestees are brought to County Jail 9 where within twenty-four hours of arriving they are booked and a determination is made as to whether the detainee will be released or housed pending arraignment.  County Jail 9 is a temporary detention facility and does not contain accommodations for extended stays.  Thus, all detainees who are classified for housing are transferred to another one of the CCSF's jails.  According to defendant, approximately 50,000 individuals are booked and processed through this system each year.

Under Department policy in effect until January 21 2004,[1] all arrestees entering County Jail 9 were subjected to a pat search and screened by a metal detector.  The policy also provided for strip searches[2] of detainees who fell into several categories, including: arrestees charged with crimes involving narcotics, weapons or violence; arrestees with a criminal history of that type; individuals arrested for a probation violation; individuals arrested outside of San Francisco; arrestees in transit to another jail; arrestees classified for housing in the general jail population; and individuals placed in "safety cells."  Safety cells are single-occupant, padded cells used to house inmates who were considered a danger to themselves or others, to be behaving in a "bizarre" manner or to be "gravely disabled."  Although not provided for in the Department's written policy, plaintiffs also contend that defendants maintained a practice of performing strip searches on all detainees who signed a form indicating that they consented to such searches.

According to defendants, the Department's strip search policy was applied as follows: upon arrival at County Jail 9 all inmates who were deemed searchable based on their charge

---

[1] The Department's new policy, which went into effect in January 2004 and currently remains in effect, is not at issue in these motions.

[2] As noted in the Court's prior order, the Court recognizes that there is a spectrum of possible search practices, including strip searches and visual body cavity searches, that fall within the general rubric of "strip searches."  The Court and the parties have used this label to cover all such practices.  As it has before, the Court will adhere to the understanding that the distinctions within this category of searches make no difference in the analysis performed for the purposes of this motion.

United States District Court

For the Northern District of California

1  or criminal history were automatically strip searched.  Other arrestees were generally not

2  strip searched unless they were identified for placement in a safety cell or, through the

3  booking process, it was determined that the detainee would not be released within twenty-

4  four hours and therefore would need to be housed in another jail facility.  For example,

5  individuals who were cited and released, individuals who were temporarily detained because

6  they were intoxicated, and individuals who said they would be able to post bail would be

7  classified for release and therefore not be strip searched.  In summary, the Department

8  adopted a policy of strip searching all individuals who were classified for housing in the

9  general jail population.

10      Strip searches at County Jail 9 have led to the discovery of weapons and other

11  contraband on the persons of arrestees.  Defendant produced evidence that from April 2000

12  through April 2005 strip searches at County Jail 9 resulted in the discovery of 73 cases of

13  illegal drugs or drug paraphernalia hidden in body cavities.  In that same time period, six

14  weapons were also discovered as a result of strip searches.  In addition, safety cell searches

15  resulted in the discovery of weapons on three other detainees.[3]

16  **II.  Procedural History**

17      Plaintiffs filed this action on April 23, 2003 alleging causes of action based on the

18  Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. section

19  1983, and several provisions of state law.  In an order issued June 10, 2004, this Court

20  granted plaintiffs' motion to certify a class under Rule 23(b)(3).  The class was defined as:

21          All persons who, during the applicable period of limitations, and
           continuing to date, were arrested on *any* charge *not* involving
22          weapons, controlled substances, or a charge of violence, and *not*
           involving a violation of parole or a violation of probation (where
23          consent to search is a condition of such probation), *and* who were
           subjected to a blanket visual body cavity strip search by
24          defendants before arraignment at a San Francisco County jail
           facility without any individualized reasonable suspicion that they

25

26      [3]Notably, defendants provided contraband reports for a period that includes searches
    conducted under both the prior policy and the newer policy.  If these reports are divided into the
27  two policy periods, the result is that 49 instances of drug-related contraband were discovered
    during the old regime and 14 instances were discovered after the change.  As for weapons, three
28  were found in non-safety cell searches prior to enactment of the new policy and three were found
    afterwards.  All safety cell discoveries were made prior to the policy change.

3

were concealing contraband.  This class also includes 1) all arrestees who were subjected to subsequent blanket strip search(es) before arraignment after the initial strip search, without any reasonable individualized suspicion that they had subsequently acquired and hidden contraband on their persons; and 2) all persons who, prior to arraignment, were subjected to blanket visual body cavity search(es) incident to placement in a "safety cell" at any of the San Francisco County jails.

(emphasis in original).

Plaintiffs now move for partial summary judgment with respect to several of their claims and regarding several affirmative defenses.  Defendant Sheriff Hennessey moves for summary judgment that he is protected by qualified immunity.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. See Celotex Corp. v. Cattrett, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. See id. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. See id.  Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting Richards

4

**United States District Court**

For the Northern District of California

1   v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).  If the non-moving party fails to

2   make this showing, the moving party is entitled to judgment as a matter of law.  See Celotex,

3   477 U.S. at 323.

4   **II.  Federal Claims**

5       Plaintiffs move for summary judgment on several issues that underlie their claim that

6   defendants' prior strip search policy was unconstitutional pursuant to the Fourth and

7   Fourteenth Amendments to the United States Constitution and therefore is actionable under

8   42 U.S.C. section 1983.

9       The claim that a strip search was performed in violation of the Fourth Amendment is

10  neither new nor unfamiliar.  In 1979 the Supreme Court reviewed the constitutionality of the

11  practice of conducting visual body-cavity searches on prison inmates following contact visits

12  by individuals from outside of the prison population.  See Bell v. Wolfish, 441 U.S. 520, 558

13  (1979).  The Court remarked that "[t]he test of reasonableness under the Fourth Amendment

14  is not capable of precise definition or mechanical application." Id. at 559.  Instead, "[i]n

15  each case it requires a balancing of the need for the particular search against the invasion of

16  personal rights that the search entails." Id.  The Court concluded that the search practice

17  there at issue was not unconstitutional given the significant interest in preserving safety

18  within the detention facility and preventing the smuggling of contraband.  Id.

19      Since Bell, the Ninth Circuit has taken up the question of the lawfulness of strip

20  searches in cases like this one involving pre-arraignment arrestees.  In the first case to

21  consider the subject, Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984) (per curiam)

22  (overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1041 (9th Cir.

23  1999) (en banc)), the court announced the governing standard that "arrestees for minor

24  offenses may be subjected to a strip search only if jail officials have a reasonable suspicion

25  that the particular arrestee is carrying or concealing contraband or suffering from a

26  communicable disease." 746 F.2d at 615.  Such reasonable suspicion may be based on

27  factors such as "the nature of the offense, the arrestee's appearance and conduct, and the

28  prior arrest record." Id. at 617.  Applying this standard, the court concluded that the policy

5

of the Bonneville County Jail in Idaho Falls, Idaho, to strip search all arrestees booked there was unconstitutional.  Id. at 617.  The court found that there was no reasonable suspicion to support the search of the plaintiff because of the minor nature of the offense (failure to pay parking tickets), the fact she had no prior record and because she had been cooperative during the search.  Id. at 618.

The court has revisited pre-arraignment searches several times, on each occasion reaffirming the standard laid out by Giles.  Ward v. County of San Diego, 791 F.2d 1329 (9th Cir. 1986) found no qualified immunity for a San Diego County Sheriff that had enacted a blanket strip search policy which resulted in the visual body cavity search of a misdemeanor arrestee prior to a determination regarding the arrestee's eligibility for an own recognizance ("O.R.") release.  See id. at 1333.  In Thompson v. City of Los Angeles, 885 F.2d 1439 (9th Cir. 1989) the court found valid the strip search of a felony grand theft auto arrestee at the Los Angeles County Jail, stating that the offense in question was "sufficiently associated with violence to justify a visual strip search."  Id. at 1447.  In a later case, however, the court found fault with the City of Los Angeles's blanket policy subjecting all felony arrestees to a visual body cavity search and the Los Angeles Police Department's ("LAPD") application of that policy to a woman arrested for a grand theft that did not involve drugs or violence.  See Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 710-16 (9th Cir. 1990).  Then, in Fuller v. M.G. Jewelry, 950 F.2d 1437 (9th Cir. 1991), the court clarified that strip searches in detention facilities are justified on less than probable cause solely by the need "to protect prisons and jails from smuggled weapons, drugs or other contraband which pose a threat to the safety and security of penal institutions."  Id. at 1447.  The court refused to extend the reasonable suspicion standard to body cavity searches for ordinary stolen property, id. at 1448, and thus ruled invalid the strip search by the LAPD of two women suspected of having stolen a ring.  Id. at 1450.

**A. Facial Attacks**

Against this backdrop, plaintiffs move for summary judgment that defendants' former strip search policy and custom was facially unconstitutional with respect to several blanket

6

**United States District Court**

For the Northern District of California

search categories: (1) arrestees with one or more prior convictions or two or more prior arrests for crimes involving drugs, weapons or violence; (2) arrestees charged with a probation violation; (3) individuals arrested on a San Francisco warrant outside of San Francisco County; (4) individuals arrested on a federal charge; (5) individuals held at a San Francisco jail while in transit to another part of the state; (6) arrestees classified for housing in a county jail; (7) individuals placed in safety cells; and (8) individuals strip searched because they signed a consent form.

Defendants do not oppose summary judgment on classifications (1) - (5). The Court therefore grants summary judgment with respect to those portions of the policy. Defendants do, however, contest that strip searches of arrestees within categories (6) - (8) violate the Fourth Amendment.

### 1. "Classification" Searches

Defendants claim that the jail system's interest in strip searching pre-trial detainees is at its zenith when arrestees are "classified" for housing in the general jail population. This is true because the introduction of outsiders into the jail system--as opposed to the temporary detention facilities at County Jail 9--poses heightened safety risks to prisoners and guards alike, given the large number of detainees in the jail system and the extended period of detention. Under defendants' vision of the governing law, these concerns allow for blanket strip searches without individualized suspicion. This position, however, fails in the face of Ninth Circuit precedent to the contrary.

Although defendants are correct that the government's penological interests are heightened when temporary detainees are introduced into the general jail population, such intermingling on its own does not create reasonable suspicion to perform a strip search. As stated by the Ninth Circuit, although the fact an arrestee is to be "placed into contact with the general jail population" is one important factor among many that may be considered in

/ / /

/ / /

/ / /

7

United States District Court

For the Northern District of California

1    gauging the reasonableness of a search, "such a factor by itself cannot justify a strip

2    search."[4]  Thompson, 885 F.2d at 1447; see also Giles, 746 F.2d at 618-19 (rejecting the

3    notion that placement in the general jail population was enough to validate a strip search

4    because "intermingling is both limited and avoidable" (citation and internal quotation

5    omitted)).  Rather than relying on intermingling, the Ninth Circuit has instead found that "the

6    reasonableness determination . . . hinges upon the nature of the . . . offense with which [the

7    arrestee] was charged."  Thompson, 885 F.2d at 1447.

8            Acknowledging this precedent, defendants insist that the intermingling of temporary

9    detainees with the general population is not the sole basis for strip searches in this case;

10   instead they claim that this factor combined with the documented record of serious and

11   widespread contraband smuggling at San Francisco's jails together provide justification for

12   the blanket policy.  They claim that a threat of these proportions was not present in the

13   Bonneville jail considered in Giles, and thus the individualized suspicion limitation

14   articulated there does not extend to this case.

15   / / /

16

17           [4]Defendants claim that Fuller is to the contrary.   There the Ninth Circuit cited with
     approval the Sixth Circuit's decision in Dobrowolskyj v. Jefferson County, 823 F.2d 955 (6th
18   Cir. 1987).  That case found that a county had not run afoul of the Fourth amendment where it
     had initially conducted a pat down search and did not perform a strip search until the plaintiff
19   "was about to be moved into contact with the general jail population."  Fuller, 950 F.2d at 1448
     (quoting Dobrowolskyj, 823 F.2d at 958).
20
             However, Fuller also approvingly cited a later Sixth Circuit case, Masters v. Crouch, 872
21   F.2d 1248 (6th Cir. 1989), for the proposition that the "fact that [the] detainee was intermingled
     with other inmates has never *alone* been found to justify a strip search without considering the
22   nature of the offense and whether the detainee might attempt to introduce weapons or contraband
     into the institution."  Fuller, 950 F.2d at 1448 (emphasis added) (quoting Masters, 872 F.2d at
23   1254).  Master relied in part on Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984), which found that
     "intermingling [with the prison population] is only one factor to consider in judging the
24   constitutionality of a strip search," id. at 394, and that where, as were the circumstances there,
     "[n]o other conceivable justification exists for the strip search," id., the search is invalid.  See
25   id. (considering the nature of the offense at issue and finding that it was "not commonly
     associated by its very nature with the possession of weapons or contraband").
26
             A fair reading of Fuller leads to the conclusion that the court there, consistent with
27   Thompson and the governing law in the Ninth Circuit, treated the intermingling of an arrestee
     with the general jail population as only one factor among many that might justify a search.
28   Notably, Thompson cited both Dobrowolskyj and Masters in arriving at its conclusion that
     intermingling alone does not justify a strip search.  See Thompson, 885 F.2d at 1447.

8

United States District Court

For the Northern District of California

As has the Ninth Circuit on several occasions, this Court recognizes the pressing need to maintain security in jails and prisons and the real and profound threats posed by the introduction of weapons and drugs into that environment. See, e.g., Thompson, 885 F.2d at 1446 ("the prevention of the introduction of weapons and other contraband into the jail . . . is indeed an extremely weighty interest"); Kennedy, 901 F.2d at 713 ("These concerns and this interest no doubt are weighty."). However, defendants claim that the Giles test does not extend to urban jails is belied by subsequent cases. Thompson specifically rejected the notion that intermingling alone--without consideration of some *individualized* basis for suspicion--was enough to justify a strip search and did so in the context of the Los Angeles County Jail system.

To adopt defendants' view that the severity of the smuggling problem can justify a blanket strip search policy would be to ignore the consistent holdings of the Ninth Circuit that reasonable suspicion may only be founded upon facts that are particular to the individual arrestee. See Giles, 746 F.2d at 615 (holding that there must be reasonable suspicion that "the particular arrestee" is concealing contraband); Ward, 791 F.2d at 1333 (summing up Giles' holding as requiring "individualized suspicion"); Thompson, 885 F.2d at 1446 ("the arresting officers must have reasonable individualized suspicion"). Such individualized suspicion may arise from knowledge of specific facts about the *individual* defendant, including "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." Giles 746 F.2d at 617. It is not enough, as defendants would have it, for the government to demonstrate that contraband smuggling is a significant problem. Instead, there must be some reasonable relationship between the criteria used to identify individuals as eligible for a strip search and the interest in preventing the introduction of contraband. See Giles, 746 F.2d at 618 (reasonableness requirement under the Fourth Amendment requires that the strip search bear some "discernible relationship to security needs" (quoting Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981)).

Defendants' policy of strip searching all arrestees classified for housing in the general jail population, coupled with their knowledge of a widespread problem with contraband

smuggling in the jail system, is an invalid basis for the blanket policy because these two facts say nothing about whether an individual arrestee classified pursuant to this policy may be concealing weapons or drugs.  Individuals destined for housing in the jail may have been classified as such solely because they are not able to post bail or because they have not yet received an O.R. review.[5]  Yet the Ninth Circuit has rejected the view that these reasons alone can justify a strip search.  See Ward, 791 F.2d at 1333 (citing with approval Tinetti v. Wittke, 479 F.Supp. 486, 490 (E.D. Wis. 1979) in which the court found unconstitutional the strip search without reasonable suspicion of an individual who was unable to post bond); id. ("In most instances the unreasonableness of a strip search conducted prior to an O.R. release determination is plain.").

Had defendants been able to proffer evidence demonstrating a high level of smuggling by individuals classified for housing who were not charged with crimes involving weapons, drugs or violence (or within another valid strip search category) then an issue of fact may have been created.  See Kennedy, 901 F.2d at 713 (stressing the importance of documentation supporting the assertion that arrestees within the strip search category smuggle contraband into the jail in greater frequency than arrestees outside of the category).  Such a showing may have demonstrated that the charge alone was not enough to identify potential smugglers and supported a reasonable suspicion that other classes of individuals destined for the jail were likely to be carrying contraband.  The evidence produced by defendants does not support such a theory.  While defendants did produce dozens of reports regarding the discovery of contraband during strip searches, the reports fail to provide any indication of the charges of the searched individuals or the reason why they were searched.  Absent such evidence there is no reasonable relationship between the criteria triggering a search (classification for housing) and the interest in conducting the search (eliminating the introduction of contraband).  See id. (finding the policy at issue unconstitutional because it

---

[5]Indeed one witness testified that the O.R. staff at County Jail 9 is only available to perform interviews for eight hours a day.  Individuals who were not given an O.R. interview during the booking process were nonetheless sent for a housing classification.

United States District Court

For the Northern District of California

rested on assumptions and societal judgments, rather than on careful deliberation and documentary evidence).

Accordingly, the Court concludes that the Department's former policy requiring strip searches of all detainees classified for housing in the general jail population without any consideration of the crime charged or any other individualized factors was unconstitutional. This, however, does not end the inquiry:

> [A] search, although not supportable under an institutional policy, is not per se unconstitutional. [After determining the policy is invalid, the court] must . . . examine the particular circumstances surrounding [the detainee's] arrest to determine whether there was reasonable suspicion to conduct a visual body-cavity search

Kennedy, 901 F.2d at 715; see also Tardiff v. Knox County, 364 F.3d 1, 6 (1st Cir. 2004). Except with regard to the individual plaintiffs discussed below, the Court does not today reach the question of whether searches performed on individual members of the class were justified based on facts particular to the individual search.  See Bull v. City & County of San Francisco, No. 03-1840, Memorandum & Order (Doc. # 162), slip op. at 11 (N.D. Cal. June 10, 2004) (stating that where the policy cannot by itself justify a search "it is a fair guess that most arrestees were searched" on the basis of the policy although "any potential individualized issues can be addressed later in the litigation and do not defeat class certification").

## 2.  Safety Cell Searches

Plaintiffs also challenge the Department's policy of automatically strip searching detainees on the sole basis that they have been designated for placement in a safety cell. Detainees were placed in a safety cell if they fit into one of six categories: "1.  She/he displays bizarre behavior which results in the destruction of property.  2.  She/he displays bizarre behavior which reveals an intent to cause self-inflicted harm.  3.  She/he appears gravely disabled and less restrictive housing is unavailable.  4.  She/he appears to be a danger to self or others.  5.  She/he requests to use the safety cell.  6.  For observation only, if it is determined by direct observation that the prisoner has ingested items that may cause injury." "Safety Cell Use" I.A.  From these classifications it appears that individuals were generally

1   placed in a safety cell, and therefore strip searched, if prison officials determined that the

2   individual appeared to be suffering from mental illness or was otherwise mentally unstable

3   such that there was a perceived risk that the detainee might engage in violent or self-

4   destructive conduct.  Plaintiffs contend that the chosen categories are vague and overbroad,

5   and therefore seek a ruling that the policy is unconstitutional on its face.

6        The Court first notes that the law on this subject is not clearly established.  Neither

7   party has found any case that discusses strip searches of pre-arraignment detainees based on

8   the determination that the individual is psychologically unstable.  Of course, such detainees

9   present unique and substantial safety concerns that prison officials should be free to address,

10  in part, by ensuring that the detainees are not hiding weapons or other contraband that may be

11  used to harm themselves or others.  Defendants here have presented evidence that mentally

12  unstable detainees in San Francisco's jail system have hidden contraband and have used such

13  contraband in attempts to harm themselves or others.  These findings are even more serious

14  in light of the Eighth Amendment obligations of jail mangers to prevent prisoner suicide.

15  See Woodward v. Correctional Medical Services, 368 F.3d 917, 929 (7th Cir. 2004).

16       Standing against these valid safety concerns are the fundamental privacy interests that

17  are infringed by the extreme intrusiveness of a strip search.  These interests are no less

18  profound when the subject of the search is mentally disturbed.  See Aiken v. Nixon, 236

19  F.Supp.2d 211, 233 (N.D.N.Y. 2002) (discussing privacy interests in the context of strip

20  searches of individuals held in a psychiatric hospital).

21       The interests at stake in safety cell searches (prison safety and prisoner privacy) are

22  therefore identical to those considered in Giles and its progeny.  The Court therefore finds

23  that the Giles requirement of reasonable individualized suspicion is the appropriate test for

24  strip searches of pre-arraignment detainees believed to be a danger to themselves or others

25  due to mental instability.  See Aiken, 236 F.Supp.2d at 233-34 (adopting "reasonable

26  suspicion" standard for strip searches of individuals who voluntarily admitted themselves

27  into a psychiatric hospital).  As articulated by Giles, important factors include "the nature of

28  the offense, the arrestee's appearance and conduct, and the prior arrest record."  746 F.2d at

12

617. Of course, in this context different conduct and charges may justify a search than in the ordinary case. For example conduct indicating a detainee may be mentally disturbed in a manner that may lead to unpredictable and potentially harmful conduct could serve as a valid justification for a search. In addition, the searches may be based on a suspicion that types of "contraband" not ordinarily believed to be dangerous, such as shoelaces and other items used for self-strangulation, may be hidden. Nonetheless, the basic framework articulated in Giles remains the appropriate analytical procedure to evaluate these claims.

Turning to the policy at issue, the constitutionality of a policy that requires that all individuals placed in a safety cell be strip searched depends on the reasons for the safety cell placement. Under Giles, if the policy requires a reasonable individualized suspicion that the detainee may be concealing drugs or other dangerous contraband, then the policy should be upheld. In the context of mentally unstable detainees, this Court finds that individualized suspicion can be founded upon behavior or circumstances indicating that the detainee may be a danger to herself or others. Such behavior gives rise to legitimately heightened concerns that the detainee could be concealing "contraband" that might be used for harmful purposes, and thus serves as a reasonable basis for a strip search.

Here, some criteria identified by the policy at issue are reasonably related to this security interest. These are categories 2 ("bizarre behavior" and "intent to cause self-inflicted harm"); 4 ("danger to self or others"); and 6 ("ingested items that may cause injury"). However, the other categories do not reveal a similar level of relatedness to the interest in safety. Category 1 ("bizarre behavior" and "destruction of property"), for example, could be applied to an individual who has done nothing more than acted in a "bizarre" fashion and committed vandalism. Category 3 ("gravely disabled" and "housing unavailable") could easily be applied to a physically disabled person who for safety reasons should not be placed in an ordinary cell. Similarly, there is no requirement in category 5 ("requests to use the safety cell") that an officer make an individualized determination that the detainee raises safety concerns. See Aiken, 236 F.Supp.2d at 233-34 (concluding that individuals who voluntarily admit themselves to a psychiatric ward do not surrender all

13

privacy protections and that strip searches of such admittees must be based on reasonable suspicion of concealed drugs or weapons, but not other concealed items).

Plaintiffs would have this Court go further and declare all of the safety cell categories to be so overbroad and vague as to be unconstitutional on their face.  Admittedly, none of the categories are defined with objective terms that substantially constrain the individual officer's discretion.  However, the process of identifying particular conduct that is indicative of psychiatric disturbance which in turn signals a propensity for violent or self-destructive conduct is inherently subjective and cannot be easily reduced to objective terms.  For this reason, officers must be given considerable latitude in making this kind of determination.  Thus it was reasonable for the Department to craft a policy that leaves broad discretion with the individual officer.

However, since such discretion is to be exercised by the individual officers, the Fourth Amendment analysis must focus on the factors considered by those officers.  An individual officer's subjective finding that a detainee was a danger to self or others, without any facts articulated in support, is not enough to end the inquiry into whether a particular search was constitutional.  Thus, although the Department's policy of allowing individual officers broad discretion to determine which detainees pose a danger to themselves or others is not unconstitutional on its face, plaintiffs may still prevail on their section 1983 claims by showing that the individual officers exercised such discretion in an unconstitutional manner.  For example, plaintiff Miki Mangosing was placed in a safety cell and strip searched pursuant to the determination that she was a danger to herself.  Records indicate that she was perceived to be under the influence, out of control and unable to remain in a sobering cell.  Whether these and other facts support the responsible officers' conclusion that Mangosing was a risk to herself is a question to be resolved by the appropriate factfinder.

In summary, the Court finds that the Department's policy of strip searching all individuals placed in a safety cell, without regard for the reasons for the particular placement, is unconstitutional on its face.  Further, even with respect to searches conducted under the policy pursuant to the determination that a detainee is a danger to self or others, that

United States District Court

For the Northern District of California

1    determination is not enough by itself to justify a search.  In such cases, where a plaintiff can

2    show that the individual officer had not conducted the search based on reasonable suspicion

3    (i.e. where the officer was unreasonable in finding that the detainee was a danger to self or

4    others) there may be liability pursuant to section 1983.

5                              **3.  Consent Searches**

6            Plaintiffs assert that the Department's alleged practice of searching all individuals that

7    provided consent to be strip searched is unconstitutional.  However, the Court need not reach

8    this issue because, as defendants point out, none of the named plaintiffs have claimed that

9    they were strip searched because they signed a consent form.

10        **B.  Reasonable Suspicion as to Individual Plaintiffs**

11                          **1.  Plaintiffs Zern and Corneau**

12           In addition to their facial attack on the Department's policy as a whole, plaintiffs ask

13   in their motion for summary judgment that plaintiffs Jonah Zern and Marcie Corneau are

14   members of the class.  Specifically, plaintiffs challenge the claim that these two individuals

15   were arrested on charges of violence.

16           Zern was charged with a violation of California Penal Code section 148.10, which

17   describes the crime of:

18               resist[ing] a peace officer in the discharge or attempt to discharge
             any duty of his or her office or employment and [where the]
19               willful resistance proximately causes death or serious bodily
             injury to a peace officer

20   See Kennedy, 901 F.2d at 705 (referring to statutory definition in the process of determining

21   whether a particular charge is a charge of violence).  Plaintiffs claim that this charge is not

22   sufficient to provide reasonable suspicion because the statute does not require that the

23   injuries to the officer result from force or violence.

24           The Ninth Circuit has held that "in some cases, the charge itself may give rise to

25   reasonable suspicion" Kennedy, 901 F.2d at 716 (citing Thompson 885 F.2d at 1447).  In

26   Thompson the Court held that the charge of grand theft auto provided reasonable suspicion

27   because that crime is "sufficiently associated with violence."  Thompson, 885 F.2d at 1447.

28   Similarly, although a violation of Penal Code section 148.10 does not necessarily involve

15

**United States District Court**

For the Northern District of California

1  force or violence, the crime is sufficiently related to violent conduct that the charge by itself

2  justifies a strip search.

3  　　　The same is true with respect to plaintiff Corneau.  She was arrested and charged

4  pursuant to California Penal Code section 243(e), which criminalizes a battery "committed

5  against a spouse. . . ."  Battery is defined under California law as "any willful and unlawful

6  use of force or violence upon the person of another."  Cal. Penal Code § 242.  Once again,

7  although plaintiffs may be correct that a violation of section 243(e) does not necessarily

8  involve violence, the crime is sufficiently associated with violent criminal conduct to justify

9  a strip search.

10  　　　Therefore, plaintiffs Zern and Corneau are not members of the class.  Defendants have

11  renewed their earlier motion for summary judgment as to these plaintiffs.  Because the Court

12  finds that the searches conducted on these individuals was based on reasonable suspicion, the

13  motion is granted.

14  　　　　　**2.  Plaintiffs Bull, Mangosing and Timbrook**

15  　　　As discussed above, even where the strip search policy was invalid a particular search

16  may still be found valid if the circumstances of the individual case created a reasonable

17  suspicion.  Plaintiffs contend that there is no basis for concluding that there was a reasonable

18  suspicion as to plaintiffs Mary Bull, Miki Mangosing, and Laura Timbrook.  However,

19  plaintiffs Bull and Mangosing were each searched pursuant to the Department's safety cell

20  policy.  The Court previously noted that these types of searches are deeply grounded in the

21  particular circumstances of the search and do not lend themselves easily to a broad brush

22  approach.  Moreover, there is substantial evidence in the record from which a reasonable

23  factfinder could conclude that both Bull and Mangosing were searched based on a reasonable

24  suspicion that they might harm themselves or others.  For example an initial psychological

25  report regarding Bull states that she was "completely out of touch with reality," that "[s]he

26  murmurs and smiles to herself very inappropriately," that "she is not responding to contact,"

27  and that she "[a]t times seems to be talking to someone invisible."  A housing report

28  regarding Mangosing states that she was "out of control."  Accepting these accounts as true

and viewing them in the light most favorable to defendants, it is clear that summary judgment should not be granted as to whether reasonable suspicion existed to strip search these plaintiffs.

However, the Court reaches a different conclusion with respect to plaintiff Timbrook. The record reveals that Timbrook was arrested pursuant to warrants for displaying a false identification, possession of a forged check with intent to defraud and burglary.  After arrest, Timbrook was classified for housing in the general jail population.  Defendant has not opposed the motion for summary judgment in Timbrook's favor and the Court finds nothing in the record that would support the conclusion that there was reasonable individualized suspicion which supported the decision to strip search her.  As such, the motion is granted with respect to plaintiff Timbrook.

### C.  Qualified Immunity

Sheriff Michael Hennessey moves for partial summary judgment on his defense of qualified immunity, claiming that the law discussed above was not sufficiently clearly established at the time the policy was in effect and that he was reasonable in crafting it as he did.

Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206 (2001). In considering a claim of qualified immunity, a court must first determine whether the plaintiffs have alleged the deprivation of an actual constitutional right.  See id. at 201.  If they have, the court must then determine whether that right was clearly established at the time of the violation.  See id.   The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id. at 202. The clearly established test is met if "'in light of the pre-existing law the unlawfulness [is] apparent.'" Galvin v. Hay, 361 F.3d 1134, 1139 (9th Cir. 2004) (quoting Hope v. Pelzer, 536

17

U.S. 730, 739 (2002)).  Even if an officer's actions violate a constitutional right, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.  Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir. 2003).

Here, Sheriff Hennessey is not protected by qualified immunity from a suit based on his decision to create a blanket policy of strip searching all individuals classified for housing in the general jail population.  As discussed above, the policy did violate plaintiffs' constitutional rights.  Moreover, the right was clearly established: in an unbroken line of precedent tracing back to 1984 the Ninth Circuit has reaffirmed the fundamental holding of Giles that a strip search of a pre-arraignment detainee must be supported by reasonable individualized suspicion.  It was also abundantly clear after Thompson that placement in the general jail population cannot "by itself cannot justify a strip search."  Thompson, 885 F.2d at 1447.  Given this clear precedent, the Court finds that reasonable minds could not differ as to what the law required.

The legal landscape was far different as to safety cell strip searches.  At the time the policy was made there was little if any authority regarding searches of mentally ill or intoxicated detainees in a jail setting.  Although this Court finds that Giles provides substantial guidance regarding how this question should be addressed, that precedent does not necessarily compel the result reached here.  Accordingly, the law regarding safety cell searches was not clearly established and therefore Sheriff Hennessey's motion is granted on this issue.

**D.  Monell Claims**

In their answer, defendants assert the affirmative defense that "[t]he complaint fails to state a federal civil rights claim against the defendants under the doctrine announced in Monell v. Department of Social Services, 436 U.S. 658 (1978)."  Plaintiffs move for summary judgment that this defense is inapplicable.

In Monell, the Supreme Court held that if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [then] the government as an entity is responsible

1   under § 1983." Id. at 694.  To establish such municipal liability, a plaintiff must satisfy four

2   conditions: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived;

3   (2) that the municipality had a policy;  (3) that this policy 'amounts to deliberate

4   indifference' to the plaintiff's constitutional right;  and (4) that the policy is the 'moving

5   force behind the constitutional violation.'"  Van Ort v. Estate of Stanewich, 92 F.3d 831, 835

6   (9th Cir. 1996) (quoting Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir.1992) (citation

7   omitted)).

8          It is clear that the Department's policy requiring strip searches of all individuals

9   classified for housing creates municipal liability under Monell.  Defendant has not contested

10  this was an official written policy of the City and County of San Francisco.  Nor is there any

11  dispute that the policy was the "moving force" behind the constitutional violations.  The

12  policy clearly required individual officers to search all detainees classified for housing,

13  without consideration of individualized suspicion.  The City and County of San Francisco is

14  therefore liable under Monell.  As such, plaintiff's motion for summary judgment on that

15  issue is granted.

16         However, a closer analysis is necessary when considering whether CCSF is liable for

17  the safety cell strip search policy.  Plaintiffs have not presented evidence that the failure of

18  the department to provide more specific restrictions on safety cell strip searches was the

19  "moving force" behind the alleged violations of the detainees' constitutional rights.  Instead,

20  plaintiffs claim that plaintiff Mary Bull was subjected to a safety cell strip search because she

21  refused to submit to a "classification" strip search.  However, even accepting these

22  allegations as true, such conduct would amount to a violation of the Department's safety cell

23  strip search policy and therefore would not create municipal liability.  See Henry v. County

24  of Shasta, 132 F.3d 512, 521 (9th Cir. 1997) (suggesting that there is no Monell claim where

25  the officers acted "in violation of the orders or policies that governed their conduct").

26  Plaintiffs also contend that Miki Mangosing was unconstitutionally strip searched after she

27  was placed in a safety cell pursuant to a finding that she was a danger to herself.  However,

28  the constitutionality of such a search would depend on whether the individual officers who

United States District Court

For the Northern District of California

19

United States District Court

For the Northern District of California

chose to place her in a safety cell had reasonable suspicion to believe that she was carrying concealed contraband.  It is therefore clear that in each of these cases if the search involved was unconstitutional, the proper defendant would be the individual officers who decided that the search should be conducted.  Under these circumstances, it is not enough that the Department left substantial discretion in the hands of the individual officers making safety cell placement determinations.  In order for there to be municipal liability, plaintiffs must show that the policy was a moving force behind the constitutional violations and that the Department's decision not to further restrict officers' discretion to order safety cell searches amounted to deliberate indifference on the part of the policymakers.  Plaintiffs' have not made such a showing and therefore their motion for summary judgment on this issue is denied.

### E.  Other Affirmative Defenses

Plaintiffs have also moved for summary judgment on defendants' affirmative defenses that the Sheriff is not a "person" liable under section 1983 and that the Sheriff is immune from exemplary and punitive damages.  Plaintiffs also ask for summary judgment with respect to the affirmative defenses of estoppel, assumption of risk, and comparative negligence.  Defendants have not opposed any of these motions and they are therefore granted.

## III.  State Claims

Plaintiffs also move for summary judgment on their strip search claims under California Penal Code section 4030 and the California Constitution.

### A.  Penal Code Section 4030

California Penal Code Section 4030 makes unlawful and provides civil liability for certain classes of strip searches of pre-arraignment misdemeanor detainees. Defendants claim that insofar as some members of the class were strip searched after they were declared eligible for housing in the general jail population, such plaintiffs cannot state a claim for relief under section 4030.  The parties' dispute in this regard centers on two portions of section 4030.  Subdivision (f) of the statute provides in pertinent part:

20

**United States District Court**

For the Northern District of California

1

> No person arrested and held in custody on a misdemeanor or
> infraction offense, except those involving weapons, controlled
> substances or violence . . . shall be subjected to a strip search or
> visual body cavity search *prior to placement in the general jail
> population*, unless a peace officer has determined there is
> reasonable suspicion based on specific and articulable facts to
> believe such person is concealing a weapon or contraband, and a
> strip search will result in the discovery of the weapon or
> contraband.

2

3

4

5

6   (emphasis added).

7   Subdivision (g) of section 4030 next provides that:

8

> [N]o person arrested and held in custody on a misdemeanor or
> infraction offense not involving weapons, controlled substances
> or violence, shall be confined in the general jail population unless
> all of the following are true: (i) The person is not cited and
> released[;] (ii) The person is not released on his or her own
> recognizance pursuant to Article 9 (commencing with Section
> 1318) of Chapter 1 of Title 10 of Part 2[;] (iii) The person is not
> able to post bail within a reasonable time not less than three
> hours.

9

10

11

12

13   Relying on several statements in the legislative history, defendants take the position

14   that these two sections, when read together, allow a strip search to be performed *either* if

15   there is reasonable suspicion *or* if the three conditions of subdivision (g) are met.  For

16   example, prior to the passage of the bill that became section 4030, the legislative counsel

17   concluded that

18

> [u]nder the proposed Section 4030 of the Penal Code, a person
> may be strip searched prior to the actual placement of the person
> in the general jail population, after the requirements of
> subdivision (g) for that placement have been met, without the
> need for compliance with the requirements of subdivision (f).

19

20

21   "Strip Searches--#5001" Letter to Honorable Marian Bergeson from Ben E. Dale (Feb. 27,

22   1984) available at 6 Cal. Assembly Journal 11304 (1983-84 Reg. Sess.).  Statements in the

23   legislative history by the Senate, Assembly and the Governor at the time of passage adopt the

24   view of the legislative counsel, thus lending further support to defendants' interpretation.

25   Plaintiffs respond with a citation to the later opinion of the California Attorney

26   General, which concludes that section 4030 prohibits warrantless pre-arraignment strip

27   searches absent reasonable suspicion "prior to the placement of [the detainee] in the general

28   population."  See Cal. Att'y Gen. Opinion No. 88-1201 (July 6, 1989).

**United States District Court**

For the Northern District of California

1    The parties dispute arises out of the ambiguity of the phrase "prior to placement in the

2    general jail population" that is used in subdivision (f) and repeated by the Attorney General's

3    opinion.  The term "placement" in this phrase could reasonably be interpreted to refer either

4    to the physical delivery of a detainee to the "general jail" structure, or any number of points

5    in time before then, although after the subdivision (g) requirements are met.  It is an accepted

6    principle of statutory interpretation that given such ambiguity reference to the legislative

7    history is allowed.  See Day v. City of Fontana, 25 Cal.4th 268, 272 (Cal. 2001); see

8    generally Stephen Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S.

9    Cal. L. Rev. 845 (1992).  Here, the legislative history confirms that "placement" under the

10   statute occurs at some time "prior to the *actual* placement of the person in the general jail

11   population" (emphasis added), but at some point after the three prerequisites for jail

12   confinement contained in subdivision (g) are met.  Thus the Court finds that section 4030 is

13   not violated where a warrantless pre-arraignment strip search is performed without

14   reasonable suspicion prior to a detainee physically arriving in the general jail population.

15   This, however, does not end the inquiry.  Some ambiguity remains regarding whether

16   a search may be performed on any prearraignment detainee who satisfies the three conditions

17   described in subdivision (g).  Defendant claims that these three factors are sufficient to

18   justify a search under the statute.  The Court rejects this view.  If defendants were correct, the

19   statute would be reduced to nothing more than a three-hour waiting period for strip searches

20   of any arrestee who is not able to post bail.  This is true because the nonoccurrence of the

21   events described in subdivisions (g)(1) and (g)(2) is entirely within the control of the

22   detaining officials.  Nothing in the legislative history requires such a sweeping result, and the

23   clear text of the statute counsels against it.  The legislative counsel's opinion states only that

24   searches may be conducted "prior to . . . actual placement."  This reasonable statement

25   cannot be converted into the sweeping conclusion that satisfaction of the subdivision (g)

26   factors alone is both necessary *and* sufficient to justify a search without reasonable suspicion.

27   That view is contrary to the express intent of the statute to protect detainees' civil rights by

28   limiting strip searches.  See Cal. Penal Code § 4030(a) ("It is the intent of the Legislature in

United States District Court

For the Northern District of California

1   enacting this section to protect the state and federal constitutional rights of the people of

2   California . . . by strictly limiting strip and body cavity searches.").  Rather than adopting this

3   radical view,[6] the Court instead finds that a search without reasonable suspicion may take

4   place consistent with section 4030 after: (1) the three subdivision (g) conditions are met; and

5   (2) the circumstances demonstrate that the individual detainee is actually destined for the

6   general jail population absent some unexpected reason for release.

7          Here, defendants have asserted that detainees assigned for housing were not strip

8   searched until detainees were to be "dressed in" to attire appropriate for the general jail

9   population.  Confirming this fact, after removing their own clothes and being strip searched,

10  inmates were instructed to put on prison uniforms.  Assuming these facts are true, searches

11  under these circumstances did not run afoul of section 4030.

12         **B.  State Law Immunities**

13         Defendants next claim that the city is immune from liability under section 4030

14  because California Government Code section 844.6[7] provides immunity for public entities

15  from suits brought by prisoners.  However, section 4030 was enacted several years after

16  section 844.6 and explicitly provides a private right of action for any detainee aggrieved by a

17  violation of the state.  <u>See</u> Cal. Penal Code § 4030(p).  Of course, there are only two classes

18  of conceivable defendants in the civil suits contemplated by this private right of action:

19  public entities making strip search policies and individual officers executing such policies.

20  Thus to find that the earlier-enacted immunity prevails over the later-enacted cause of action

21  would be to nullify at least half of the potential scope of the private cause of action.

22

23         [6]The Court also rejects plaintiffs' view that subdivision (g) prohibits incorporation of an
24  inmate into the general jail population prior to an O.R. hearing.  The clear text of the statute is
    to the contrary and requires only that the detainee "is not released on his or her own
25  recognizance pursuant to" Penal Code section 1318 <u>et seq.</u>, which governs O.R. releases.  This
    language clearly requires only the nonoccurrence of an O.R. release, and creates no substantive
26  rights to a hearing prior to housing in the general jail population.

27         [7]The statute states: "(a) Notwithstanding any other provision of this part, except as
    provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1
28  (commencing with Section 3500) of Part 3 of the Penal Code, a public entity is not liable for:
    . . . (2) An injury to any prisoner."  Cal. Gov't Code § 844.6.

United States District Court

For the Northern District of California

1    However, the later statute is more specific and does not limit the suits to either of these

2    classes of defendants.  The Court therefore concludes that immunity on these grounds does

3    not apply.

4          Defendants' similar claim that Sheriff Hennessey is immune from liability under

5    California Government Code section 820.2[8] also fails.  That statute opens with the

6    qualification that it applies "[e]xcept as otherwise provided by statute."  Cal. Gov't Code §

7    820.2.  As before, the more recent authorization of suit in section 4030 falls squarely within

8    the statutory exception in section 820.2.  Therefore no immunity applies.

9         **C.  State Constitutional Claims**

10        Defendants claim that plaintiffs' cause of action brought under the California

11    Constitution's privacy clause also fail.  Defendants state that in this context the California

12    constitution's privacy protection should be interpreted consistent with federal interpretations

13    of Fourth Amendment protection.  <u>See</u> <u>In re York</u>, 9 Cal. 4th 1133, 1149 (1995).  Since the

14    Court has rejected the claim that blanket strip searches of all detainees entering the general

15    jail population may be strip searched consistent with the Fourth Amendment, the same

16    argument must also be rejected here.  Further, defendant has cited no case in which the

17    statutory immunity created by Government Code section 844.6 was interpreted to be an

18    available defense against a claim brought under the California Constitution's privacy clause.

19         **D.  Other Defenses**

20        Plaintiffs also moved for summary judgment with regard to several other of plaintiffs'

21    affirmative defenses: that plaintiffs failed to satisfy claim presentment requirements; that

22    defendants are immune as public employees engaged in the execution and enforcement of

23    law under Government Code section 820.4; and that defendants are immune as third parties

24    under Government Code section 820.8.  Defendants have not opposed these motions and they

25    are therefore granted.

26

27          [8]The statute states: "Except as otherwise provided by statute, a public employee is not
liable for an injury resulting from his act or omission where the act or omission was the result

28    of the exercise of the discretion vested in him, whether or not such discretion be abused."  Cal.
Gov't Code § 820.2.

**CONCLUSION**

For the foregoing reasons, the Court rules as follows:

1.    Plaintiff's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

2.    Defendant Sheriff Hennessey's motion for summary judgment regarding qualified immunity is GRANTED IN PART and DENIED IN PART.

3.    Defendant's renewed motion for summary judgment regarding plaintiffs Zern and Corneau is GRANTED.

**IT IS SO ORDERED.**

Dated: September 22, 2005

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

*United States District Court*

*For the Northern District of California*