**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARY BULL, et al.,

       Plaintiffs,

  v.

CITY & COUNTY OF SAN FRANCISCO, et al.,

       Defendants.

_____/

No. C 03-01840 CRB

**AMENDED MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

In this class action, plaintiffs challenge the former policy of the City and County of San Francisco ("CCSF") of performing strip searches on certain classes of pre-arraignment detainees at CCSF's jails. The Court previously issued a Memorandum and Order on September 22, 2005, but then granted defendant's motion for reconsideration in order to address several important issues in this lawsuit. The Court received additional briefing and held an oral argument regarding the motion for reconsideration. In light of the Court's desire to reach a final resolution of those issues, the Court has reconsidered its previous Order to a degree beyond the scope of the motion for reconsideration. This Amended Memorandum and Order Re: Motions for Summary Judgment therefore supercedes the Court's Memorandum and Order of September 22, 2005. After carefully reviewing the memoranda and evidentiary record submitted by the parties, and having had the benefit of two oral

United States District Court

For the Northern District of California

1  arguments, the Court hereby GRANTS IN PART and DENIES IN PART plaintiffs' motion

2  for summary judgment.

3      Defendant Michael Hennessey also filed a motion for summary judgment regarding

4  qualified immunity.  That motion is GRANTED IN PART and DENIED IN PART.  Finally,

5  defendants' motion for summary judgment with respect to plaintiffs Zern and Corneau is

6  GRANTED.

7                           **BACKGROUND**

8  **I.    Factual History**

9      The San Francisco Sheriff's Department ("the Department") oversees six county jails.

10 After arrest, all arrestees are brought to County Jail No. 9 where they are booked within 24

11 hours of arriving and a determination is made as to whether the detainee will be released or

12 housed pending arraignment.  County Jail No. 9 is a temporary detention facility and does not

13 contain accommodations for extended stays.  Thus, all detainees who are classified for

14 housing are transferred to another one of the CCSF's jails.  According to defendants,

15 approximately 50,000 individuals are booked and processed through this system each year.

16     Under Department policy in effect until January 21 2004,[1] all arrestees entering

17 County Jail 9 were subjected to a pat search and screened by a metal detector.  The policy

18 also provided for strip searches[2] of detainees who fell into a number of categories, including:

19 arrestees charged with crimes involving narcotics, weapons or violence; arrestees with a

20 criminal history of that type; individuals arrested for a probation violation; individuals

21 arrested outside of San Francisco; arrestees in transit to another jail; arrestees classified for

22 housing in the general jail population; and individuals placed in "safety cells."  Safety cells

23 are single-occupant, padded cells used to house inmates who were considered a danger to

24

25 [1]The Department's new policy, which went into effect in January 2004 and currently
   remains in effect, is not at issue here.

26 [2]As noted previously, the Court recognizes that there is a spectrum of possible search
27 practices, including strip searches and visual body cavity searches, that fall within the general
   rubric of "strip searches."  The Court and the parties have used this label to cover all such
   practices. As it has before, the Court will adhere to the understanding that the distinctions within
28 this category of searches make no difference in the analysis performed for the purposes of this
   motion.

themselves or others, to be behaving in a "bizarre" manner or to be "gravely disabled." Although not provided for in the Department's written policy, plaintiffs also contend that defendants maintained a practice of performing strip searches on all detainees who signed a form indicating that they consented to such searches.

According to defendants, the Department's strip search policy was applied as follows: upon arrival at County Jail No. 9 all inmates who were deemed searchable based on their charge or criminal history were automatically strip searched.  Other arrestees were generally not strip searched unless they were identified for placement in a safety cell or, through the booking process, it was determined that the detainee would not be released within twenty-four hours and therefore would need to be housed in another jail facility.  For example, individuals who were cited and released, individuals who were temporarily detained because they were intoxicated, and individuals who said they would be able to post bail would be classified for release and therefore not be strip searched.  In summary, the Department adopted a policy of strip searching all individuals who were classified for housing in the general jail population.

Strip searches at County Jail No. 9 have led to the discovery of weapons and other contraband on the persons of arrestees.  Defendant produced evidence that from April 2000 through April 2005 strip searches at County Jail No. 9 resulted in the discovery of 73 cases of illegal drugs or drug paraphernalia hidden in body cavities.  In that same time period, six weapons were also discovered as a result of strip searches.  In addition, safety cell searches resulted in the discovery of weapons on three other detainees.[3]

## II.    Procedural History

Plaintiffs filed this action on April 23, 2003, alleging causes of action based on the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. section

[3]Defendants provided contraband reports for a period that includes searches conducted under both the prior policy and the newer policy.  If these reports are divided into the two policy periods, the result is that 49 instances of drug-related contraband were discovered during the old regime and 14 instances were discovered after the change.  As for weapons, three were found in non-safety cell searches prior to enactment of the new policy and three were found afterwards.  All safety cell discoveries were made prior to the policy change.

3

1983, and several provisions of state law.  In an order issued June 10, 2004, this Court

granted plaintiffs' motion to certify a class under Rule 23(b)(3).  The class was defined as:

> All persons who, during the applicable period of limitations, and continuing to date, were arrested on *any* charge *not* involving weapons, controlled substances, or a charge of violence, and *not* involving a violation of parole or a violation of probation (where consent to search is a condition of such probation), *and* who were subjected to a blanket visual body cavity strip search by defendants before arraignment at a San Francisco County jail facility without any individualized reasonable suspicion that they were concealing contraband.  This class also includes 1) all arrestees who were subjected to subsequent blanket strip search(es) before arraignment after the initial strip search, without any reasonable individualized suspicion that they had subsequently acquired and hidden contraband on their persons; and 2) all persons who, prior to arraignment, were subjected to blanket visual body cavity search(es) incident to placement in a "safety cell" at any of the San Francisco County jails.

(emphasis in original).

Plaintiffs previously moved for partial summary judgment with respect to several of

their claims and regarding several affirmative defenses.  Defendant Sheriff Hennessey also

moved for summary judgment regarding his assertion that he is protected by qualified

immunity.  The Court issued a Memorandum and Order dated September 22, 2005, that

addressed both of those motions.  Subsequently, the CCSF filed a motion for reconsideration

to address five categories of strip searches on which the Court granted summary judgment in

favor of the plaintiff because the CCSF did not oppose the motion.  Although the CCSF did

not, in fact, oppose plaintiff's motion as to those categories, the Court granted the motion for

reconsideration in order to resolve as many issues on the merits as possible.[4]  To that end, the

Court has reconsidered the entire motion and issues this Memorandum and Order.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[4]The Court erred in carving out two of the five categories discussed in defendant's motion for leave to file a motion for reconsideration.  The Court will address all five categories raised in defendant's motion for reconsideration in this Order.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. See Celotex Corp. v. Cattrett, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. See id. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. See id. Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. See Celotex, 477 U.S. at 323.

## II.    Fourth Amendment Challenges to Strip Searches

The claim that a strip search was performed in violation of the Fourth Amendment is neither new nor unfamiliar. In 1979, the Supreme Court reviewed the constitutionality of the practice of conducting visual body-cavity searches on prison inmates following contact visits by individuals from outside of the prison population. See Bell v. Wolfish, 441 U.S. 520, 558 (1979). The Court remarked that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Id. at 559. Instead, "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Id. The Court concluded that the search practice

5

United States District Court

For the Northern District of California

there at issue was valid given the severity of the charges, the significant risks of smuggling contraband posed by contact visits, and the significant interest in preserving safety within the detention facility.  Id.

Since Wolfish, the Ninth Circuit has taken up the question of the lawfulness of strip searches in cases like this one involving pre-arraignment arrestees.  In the first case to consider the subject, Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984) (per curiam) (overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1041 (9th Cir. 1999) (en banc)), the court announced the governing standard that "arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease."  746 F.2d at 615.  Such reasonable suspicion may be based on factors such as "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record."  Id. at 617.  Applying this standard, the court concluded that the policy of the Bonneville County Jail in Idaho Falls, Idaho, to strip search all arrestees booked there was not proper in light of the institution's security.  Id. at 617.  The court ruled that there was no reasonable suspicion to support the search of the plaintiff because of the minor nature of the offense (failure to pay parking tickets), the fact she had no prior record, and because she had been cooperative during the search.  Id. at 618.  The court further distinguished Wolfish by noting that arrest and confinement is unplanned, thereby rendering a blanket strip search policy ineffective to the law enforcement objectives of preventing contraband from entering the county jail.

The Ninth Circuit has revisited pre-arraignment searches several times, on each occasion reaffirming the individualized reasonable suspicion standard laid out by Giles.  In Ward v. County of San Diego, 791 F.2d 1329 (9th Cir. 1986), the court found no qualified immunity for a San Diego County Sheriff that had enacted a blanket strip search policy which resulted in the visual body cavity search of a misdemeanor arrestee prior to a determination regarding the arrestee's eligibility for an own recognizance ("O.R.") release.  See id. at 1333 ("In most instances the unreasonableness of a strip search conducted prior to

**United States District Court**

For the Northern District of California

1   an O.R. release determination is plain.").  In Thompson v. City of Los Angeles, 885 F.2d

2   1439 (9th Cir. 1989), the court found that the strip search of a felony grand theft auto arrestee

3   at the Los Angeles County Jail was valid based on the charge alone, stating that the offense

4   in question was "sufficiently associated with violence to justify a visual strip search."  Id. at

5   1447.  In a later case, however, the Ninth Circuit found fault with the City of Los Angeles's

6   blanket policy subjecting all felony arrestees to a visual body cavity search and the Los

7   Angeles Police Department's ("LAPD") application of that policy to a woman arrested for a

8   grand theft that did not involve drugs or violence.  See Kennedy v. Los Angeles Police Dept.,

9   901 F.2d 702, 710-16 (9th Cir. 1990) (impliedly overruled on other grounds by Hunter v.

10  Bryant, 502 U.S. 224 (1991) (per curiam)).  In Kennedy, the court emphasized that the

11  severity of the charge bore no reasonable relationship to institutional security concerns.  Id. at

12  713 ("[T]he enacted policy, if it is to be constitutional, must be 'reasonably related' to the

13  penal institution's interest in maintaining security.").  Then, in Fuller v. M.G. Jewelry, 950

14  F.2d 1437 (9th Cir. 1991), the court clarified that strip searches in detention facilities are

15  justified on less than probable cause solely by the need "to protect prisons and jails from

16  smuggled weapons, drugs or other contraband which pose a threat to the safety and security

17  of penal institutions."  Id. at 1447.  The court refused to extend the reasonable suspicion

18  standard to body cavity searches for ordinary stolen property, id. at 1448, and ruled invalid

19  the strip search by the LAPD of two women suspected of having stolen a ring.  Id. at 1450.

20                                           **DISCUSSION**

21          Plaintiffs move for summary judgment to determine liability on several issues that

22  underlie their claim that defendants' prior strip search policy was unconstitutional pursuant to

23  the Fourth and Fourteenth Amendments to the United States Constitution and actionable

24  under 42 U.S.C. section 1983.  In particular, plaintiffs challenge the following search

25  categories within the policy: (1) arrestees with one or more prior convictions or two or more

26  prior arrests for crimes involving drugs, weapons or violence within the previous five years;

27  (2) arrestees charged with a probation violation (who have not consented to searches of their

28  persons as a condition of probation); (3) individuals arrested on a San Francisco warrant

outside of San Francisco County; (4) individuals arrested on a U.S. Marshal hold; (5) individuals held at a San Francisco jail while in transit to another part of the state; (6) arrestees classified for housing in a county jail; (7) individuals placed in safety cells; and (8) individuals strip searched because they signed a consent form.[5]  Plaintiffs' challenge applies only to eligible class members, which does not include anyone arrested on charges involving weapons, controlled substances, or violence, and also does not include anyone who was strip searched upon an individualized finding of reasonable suspicion that an arrestee may be concealing weapons or contraband.

**I.     Standing**

As a threshold matter, defendants contest plaintiffs' standing to challenge any of the abovementioned categories, (1) through (8) *supra*, pursuant to which none of the named plaintiffs were searched.  Defendants argue that plaintiffs searched under one of these categories do not have standing to challenge other categories because no "case or controversy" yet exists.  Yet defendants do not dispute that the named plaintiffs were personally injured and have standing to bring this lawsuit on other grounds.  See Lewis v. Casey, 518 U.S. 343, 349 (1996).  Nor do defendants argue that plaintiffs did not have standing to bring this action when it was initiated.

Plaintiffs have standing to make a facial challenge as to the constitutionality of the City's former strip search policy.  The Court has previously determined that the named plaintiffs are adequate and typical class representatives who will actively pursue this litigation and represent the interests of all class members.  Moreover, defendants do not dispute that the class as a whole includes individuals searched pursuant to all of the aforementioned categories.  Defendants' argument amounts to little more than a challenge to the class definition, which is not the subject of this motion.

---

[5] Plaintiffs' original Memorandum of Points and Authorities in Support of Partial Summary Judgment did not include any argument regarding "secondary searches," the category of searches that included individuals searched for a second time prior to arraignment.  Therefore the Court does not address that issue here.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Moreover, defendants misapply the two district court cases they cite in support of their argument. The issue in both of those cases was whether the putative named plaintiffs had standing to bring the lawsuit, which is not disputed here. Accordingly, the Court finds that plaintiffs do have standing to challenge the CCSF's former strip search policy on its face, including categories (1) through (8) listed above. To the extent that defendants standing argument challenges whether plaintiffs can make an as-applied challenge to categories in which no named plaintiff was searched, defendants are correct. An as-applied challenge to an individual category requires a factual foundation for the Court to analyze, which can only be provided by the facts surrounding the strip search of an individual.

## II. Facial Challenges

Plaintiff's motion for partial summary judgment avers that the categories of the CCSF's policy listed above are unconstitutional on their face. Defendants urge the Court to apply the standard set forth in United States v. Salerno to determine whether the relevant parts of the policy here are unconstitutional. In Salerno, the Supreme Court held that a facial challenge to a legislative act is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act might be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).[6]

The Ninth Circuit, however, has not applied Salerno to cases challenging the constitutionality of strip search policies. See Fuller v. M.G. Jewelry, 950 F.2d 1437, 1452 (9th Cir. 1991) (noting that the Ninth Circuit has held the "LAPD strip search policy is unconstitutional on its face" even though it never applied Salerno); see also Tardiff v. Knox County, 356 F.3d 1, 6 (1st Cir. 2004) (Boudin, C. J.). Instead, case law in this circuit has used the analysis first enumerated in Bell v. Wolfish to determine whether the *policy* itself is

---

[6]In City of Chicago v. Morales, 527 U.S. 41, 55 n.22 (1999), a plurality of the Supreme Court called into question the continuing viability of the Salerno standard. Subsequently, however, the Ninth Circuit has reaffirmed that the general standard for a facial constitutional challenge to a legislative act not involving the First Amendment or abortion remains the one set forth in United States v. Salerno, 481 U.S. 739 (1987). See S.D. Myers, Inc. v. City and County of San Francisco, 253 U.S. 461, 467 (9th Cir. 2001) (recognizing that the Supreme Court has overruled Salerno in some contexts, but stating that "we will not reject Salerno in other contexts until a majority of the Supreme Court clearly directs us to do so").

**United States District Court**
For the Northern District of California

1   unconstitutional.  See Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 714 (9th Cir.

2   1990) ("On balance, the LAPD's policy cannot withstand the constitutional review

3   articulated in Wolfish.").[7]  Therefore, the Court will follow Ninth Circuit precedent and

4   analyze the facial challenges under Wolfish.

5       **A.   "Classification" Searches**

6       Defendants claim that the jail system's interest in strip searching pre-trial detainees is

7   at its zenith when arrestees are "classified" for housing in the general jail population.  This is

8   true because the introduction of outsiders into the jail system–as opposed to the temporary

9   detention facilities at County Jail No. 9–poses heightened safety risks to prisoners and guards

10  alike, given the large number of detainees in the jail system and the extended period of

11  detention.  Under defendants' view of the governing law, these concerns allow for blanket

12  strip searches without individualized suspicion.  This position, however, fails in the face of

13  Ninth Circuit precedent to the contrary.

14      Although defendants are correct that the government's penological interests are

15  heightened when temporary detainees are introduced into the general jail population, such

16  intermingling on its own does not create reasonable suspicion to perform a strip search.  As

17  stated by the Ninth Circuit, although the fact an arrestee is to be "placed into contact with the

18  general jail population" is one important factor among many that may be considered in

19  gauging the reasonableness of a search, "such a factor by itself cannot justify a strip search."[8]

20

21      [7]Even if the policy itself is deemed to be unconstitutional, however, the liability
    determination is not complete. Defendants can still show that a particular search was conducted
22  on the basis of individualized suspicion rather than a categorical application of the policy.  See
    Kennedy, 901 F.2d at 715; see also Fuller, 950 F.2d at 1446 (noting that even where an
23  unconstitutional blanket policy exists, a search can be justified on other grounds).  Other than
    the individuals discussed below, the Court does not have the occasion to address whether any
24  individual searches were unconstitutional.

25      [8]Defendants claim that Fuller is to the contrary.  There the Ninth Circuit cited with
    approval the Sixth Circuit's decision in Dobrowolskyj v. Jefferson County, 823 F.2d 955 (6th
26  Cir. 1987).  That case found that a county had not run afoul of the Fourth Amendment where it
    had initially conducted a pat down search and did not perform a strip search until the plaintiff
27  "was about to be moved into contact with the general jail population."  Fuller, 950 F.2d at 1448
    (quoting Dobrowolskyj, 823 F.2d at 958).
28

    However, Fuller also approvingly cited a later Sixth Circuit case, Masters v. Crouch, 872

1    Thompson, 885 F.2d at 1447; see also Giles, 746 F.2d at 618-19 (rejecting the notion that

2    placement in the general jail population was enough to validate a strip search because

3    "intermingling is both limited and avoidable" (citation and internal quotation omitted)).

4    Rather than relying on the mere fact of intermingling, the Ninth Circuit has consistently

5    noted that factors to be considered in determining whether reasonable suspicion exists to

6    warrant a strip search include "the nature of the offense, an arrestee's appearance and

7    conduct, and the prior arrest record." Giles, 746 F.2d at 617; see also Thompson, 885 F.2d at

8    1446.

9         Defendants' additional justification–the documented record of serious and widespread

10   contraband smuggling at San Francisco's jails–is not sufficient to uphold the constitutionality

11   of the categorical strip search policy.  As has the Ninth Circuit on several occasions, the

12   Court recognizes the pressing need to maintain security in jails and prisons and the real and

13   profound threats posed by the introduction of weapons and drugs into that environment.  See,

14   e.g., Thompson, 885 F.2d at 1446 ("the prevention of the introduction of weapons and other

15   contraband into the jail ... is indeed an extremely weighty interest");  Kennedy, 901 F.2d at

16   713 ("These concerns and this interest no doubt are weighty.").  Yet to adopt defendants'

17   view that the severity of the smuggling problem can justify a blanket strip search policy

18   would be to ignore the consistent holdings of the Ninth Circuit that reasonable suspicion may

19   only be founded upon facts that are particular to the individual arrestee.  See Giles, 746 F.2d

20

21   F.2d 1248 (6th Cir. 1989), for the proposition that the "fact that [the] detainee was intermingled
     with other inmates has never *alone* been found to justify a strip search without considering the

22   nature of the offense and whether the detainee might attempt to introduce weapons or contraband
     into the institution." Fuller, 950 F.2d at 1448 (emphasis added) (quoting Masters, 872 F.2d at

23   1254).  Master relied in part on Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984), which found that
     "intermingling [with the prison population] is only one factor to consider in judging the

24   constitutionality of a strip search," id. at 394, and that where, as were the circumstances there,
     "[n]o other conceivable justification exists for the strip search," id., the search is invalid.  See

25   id. (considering the nature of the offense at issue and finding that it was "not commonly
     associated by its very nature with the possession of weapons or contraband").

26

27        A fair reading of Fuller leads to the conclusion that the court there, consistent with
     Thompson and the governing law in the Ninth Circuit, treated the intermingling of an arrestee

28   with the general jail population as only one factor among many that might justify a search.
     Notably, Thompson cited both Dobrowolskyj and Masters in arriving at its conclusion that
     intermingling alone does not justify a strip search.  See Thompson, 885 F.2d at 1447.

11

United States District Court

For the Northern District of California

1  at 615 (holding that there must be reasonable suspicion that "the particular arrestee" is

2  concealing contraband); Ward, 791 F.2d at 1333 (summing up Giles' holding as requiring

3  "individualized suspicion"); Thompson, 885 F.2d at 1446 ("the arresting officers must have

4  reasonable individualized suspicion").   It is not enough, as defendants would have it, for the

5  government to demonstrate that contraband smuggling is a significant problem.  Instead,

6  there must be some reasonable relationship between the criteria used to identify individuals

7  as eligible for a strip search and the interest in preventing the introduction of contraband.

8  See Giles, 746 F.2d at 618 (reasonableness requirement under the Fourth Amendment

9  requires that the strip search bear some "discernible relationship to security needs") (quoting

10  Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981)).

11  　　　Defendants have proffered no evidence demonstrating a high level of smuggling by

12  individuals classified for housing who were not charged with crimes involving weapons,

13  drugs or violence (or within another valid strip search category).  See Kennedy, 901 F.2d at

14  713 (stressing the importance of documentation supporting the assertion that arrestees within

15  the strip search category smuggle contraband into the jail in greater frequency than arrestees

16  outside of the category).  Such a showing may have demonstrated that the charge alone was

17  not enough to identify potential contraband smugglers and supported a reasonable suspicion

18  that other classes of individuals destined for the jail were likely to be security risks.  While

19  defendants did produce dozens of reports regarding the discovery of contraband during strip

20  searches, the reports fail to provide any indication of the charges of the searched individuals

21  or the reason why they were searched.  Absent such evidence there is no reasonable

22  relationship between the criteria triggering a search (classification for housing) and the

23  interest in conducting the search (eliminating the introduction of contraband).  See id.

24  (finding the policy at issue unconstitutional because it rested on assumptions and societal

25  judgments, rather than on careful deliberation and documentary evidence).

26  　　　Defendants' policy of strip searching all arrestees classified for housing in the general

27  jail population, coupled with their knowledge of a widespread problem with contraband

28  smuggling in the jail system, is an invalid basis for the blanket policy because these two facts

1  say nothing about whether an individual arrestee classified pursuant to this policy may be

2  concealing weapons or drugs.  Accordingly, the Court concludes that the Department's

3  former policy requiring strip searches of all detainees classified for housing in the general jail

4  population without any consideration of the crime charged or any other individualized factors

5  was unconstitutional. Plaintiff's motion for summary judgment as to classification searches is

6  therefore GRANTED.

7        **B.**    **Criminal History Searches**

8        Plaintiffs challenge defendants' former policy as it relates to arrestees with one or

9  more prior convictions or two or more prior arrests for crimes involving drugs, weapons or

10  violence within the prior five years.  Plaintiffs urge the Court to follow Watt v. City of

11  Richardson, a Fifth Circuit case where a strip search of a woman as a result of an old drug

12  conviction was deemed unconstitutional.  849 F.2d 195 (5th Cir. 1988).

13        The Court is unpersuaded in this instance by Watt, particularly in light of Ninth

14  Circuit precedent to the contrary.  First, the court in Watt made clear that only the particular

15  search in question, not all searches under that policy, was unconstitutional.  Second, the

16  policy in Watt had no limiting restrictions, unlike here, where the policy requires a prior

17  conviction or multiple arrests to have occurred within the previous five years.

18        Most importantly, it is now settled law in the Ninth Circuit that reasonable suspicion

19  may be based on factors such as "the nature of the offense, the arrestee's appearance and

20  conduct, and the *prior arrest record*." Giles, 746 F.2d at 617 (emphasis added).  Plaintiffs

21  urge the Court to require more than a prior arrest record of the type included in this category

22  in order to make a finding that individual reasonable suspicion exists.  Plaintiffs, however,

23  cite to no case supporting that proposition and the Court is not inclined to agree.  A prior

24  arrest record that includes offenses or arrests for crimes that courts have long recognized

25  pose a sufficient risk to institutional security outweighs the arrestees' privacy interests,

26  particularly when that record occurred within a limited time period such as the prior five

27  years.  The Court therefore finds as a matter of law that defendants had reasonable suspicion

28  to search individuals pursuant to this category based on their prior record involving drugs,

United States District Court

For the Northern District of California

1   weapons or violence.  As a result, the Court DENIES plaintiff's motion for summary

2   judgment as to this category and GRANTS summary judgment for defendants.

3          **C.     Probation Violations**

4          As a threshold matter, the class definition makes clear that the only individuals

5   challenging the City's policy of strip searching all arrestees charged with a probation

6   violation are those who did not consent to searches of their persons as a condition of

7   probation.  Therefore, the Court's inquiry focuses on the apparently narrow group of

8   arrestees who were strip searched pursuant to this category of the policy.  See Declaration of

9   Arturo Faro ¶ 7 (estimating that two-thirds of probationers consent to searches as a condition

10  of probation).  This category of arrestees is further reduced when probationers arrested for

11  crimes involving violence, drugs, or weapons are excluded.  Furthermore, the Court assumes

12  that none of the arrestees in this category had a prior conviction–including their conviction

13  underlying the period of probation at issue–involving drugs, violence or weapons because

14  otherwise they could fall into the "criminal history" category and validly be strip searched.

15         Defendants correctly assert that probationers do not benefit from the same protections

16  as average citizens and therefore they have a diminished expectation of privacy.  See United

17  States v. Knights, 534 U.S. 112 (2001). Defendants essentially argue that under the Wolfish

18  balancing test, that diminished expectation of privacy reduces the threshold for institutional

19  security concerns sufficiently to defeat summary judgment.  Yet probationers maintain some

20  privacy rights.  See Kennedy, 901 F.2d at 712 ("Convicted prisoners ... retain some

21  constitutional liberties.").   Therefore, the Fourth Amendment requires that some nexus exists

22  between the security needs of the institution and a strip search of individuals arrested for

23  violating probation.  In fact, the enacted policy must be reasonably related to the institution's

24  interest in safety.  See Kennedy, 901 F.2d at 713.  In this narrow category of arrestees who

25  were neither previously convicted of, nor presently charged with, offenses associated with

26  heightened risks of concealing contraband, the mere fact that an individual was arrested for a

27  probation violation is insufficient to warrant a strip search.  Some degree of individualized

28  suspicion that a probation violator poses a safety risk must exist in order to justify a strip

search.  Yet defendants had no individualized suspicion of security risks when strip searching individuals pursuant to this categorical policy.  As a result, the Court finds unconstitutional defendants' policy of strip searching probation violators for whom consent to searches of their persons was not a condition of probation.  See Marriott v. County of Montgomery, 227 F.R.D. 159 (N.D.N.Y. 2005) (preliminarily enjoining county policy of strip searching probation violators).  Thus plaintiff's motion for summary judgment as to this narrow category is GRANTED.

### D.   Arrestees Transferred from/to Other Jurisdictions

Plaintiffs challenge the policy as it relates to categories of arrestees who were strip searched because they were (1) arrested on a San Francisco warrant outside of San Francisco County, (2) arrested on a U.S. Marshal hold, or (3) held at a San Francisco jail while in transit to another part of the state.  The Court first notes that both parties' arguments regarding these categories are vague, speculative, and generalized.  As a result, it is difficult for the Court to determine with any precision whether arrestees in this category are any different from those arrested in San Francisco who were subject to the former strip search policy.  But see Decl. of Ellen Brin ISO Mot. for Reconsideration.

It is, however, clear that defendants' justification for strip searching arrestees in these categories because they may have had contact visits from lawyers or doctors is insufficient to withstand careful scrutiny.[9]  Defendants contend that state law permits arrestees housed in jail to receive contact visits from professionals such as their attorney, physicians, surgeons, or psychologists.  See Def. Mem. at 4 n.3.  Yet defendants provide no evidence that any professional has attempted to smuggle contraband into the jail through a client or patient.  The Court is unwilling, without any evidence to the contrary, to accept the notion that professionals who work within the criminal justice system would conspire with arrestees to introduce contraband to the general jail population.  Therefore the Court is unpersuaded by the argument that this type of contact visit poses a risk to jail security.

---

[9]Defendants present no argument or evidence that anyone other than legal or medical professionals can visit with arrestees in these categories.  Accordingly, the Court makes no findings regarding any contact visits from the general public.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Defendants also argue, and plaintiffs appear to concede, that at least some of the

2   arrestees in these categories mingled with the general jail population before being transferred

3   to San Francisco.  This presents a different scenario from that of the line of Ninth Circuit

4   case law, beginning with Giles, holding strip search policies unconstitutional by

5   distinguishing Wolfish.  There, the fact that pre-arraignment arrestees could not anticipate

6   intermingling with the general jail population raised the threshold of individualized suspicion

7   necessary to justify a strip search.  See Giles, 746 F.2d at 617 (distinguishing the planned

8   visits in Wolfish from the "unplanned events" of being arrested and confined in County jail

9   and noting that "the policy could not possibly deter arrestees from carrying contraband").

10  But where an arrestee has knowledge that he may intermingle with the general jail population

11  in San Francisco, a different scenario is presented which leaves open the possibility that

12  contraband could be intentionally smuggled into a San Francisco jail.  The Court cannot say

13  as a matter of law based on this record that searches pursuant to these categories are

14  unconstitutional because it is possible that the heightened risk to institutional security

15  outweighs the arrestees' privacy interests in some instances.  Furthermore, the Court is

16  unwilling to make a determination as a matter of law based on speculative, conclusory and

17  disputed allegations.  While the Court's analysis with regard to classification searches above

18  would apply to any arrestees whose first contact with the criminal justice system occurred at

19  County Jail No. 9, it is impossible to determine from the record whether anyone fits that

20  description.  Accordingly, plaintiffs' motion for summary judgment regarding these three

21  categories is DENIED.

22  **E.   Consent Searches**

23  Plaintiffs contend that defendants' former custom and practice of strip searching

24  arrestees upon their consent was unconstitutional.  Defendants did not oppose plaintiff's

25  motion as to this category of strip searches.  Still, in order to prevail on such a claim,

26  plaintiffs must show that consent was not freely given as a matter of law.  See United States

27  v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997) (citing Schneckloth v. Bustamonte,

28  412 U.S. 218 (1973)).  Under the totality of the circumstances analysis required here, the

United States District Court

For the Northern District of California

Ninth Circuit has identified five factors to be considered in determining the voluntariness of a strip search. See United States v. Patayan Soriano, 361 F.3d 494 (9th Cir. 2004) (citing cases). Those that are relevant here include whether (1) the person was in custody; (2) the officer had his weapon drawn or was otherwise threatening force; and (3) the officer informed the suspect of his right to refuse consent. Id. at 502. The Ninth Circuit has never applied these factors to consent for a strip search, but it is self-evident that, at a minimum, factors that are relevant to the search of an automobile would be relevant to the more invasive procedure of a strip search.[10]

This inquiry is a fact-intensive one that requires a careful evaluation of evidence relating to a determination of voluntariness. The Court, however, does not decide the validity of an individual search pursuant to this policy. In order to rule on the constitutionality of this category of searches, the Court must therefore find that, as a matter of law, consent to a strip search under this custom or practice could not have been voluntary under the circumstances at County Jail No. 9.[11] Moreover, two conflicting factors relating to every consent search are not in dispute. First, all those searched were in custody. Second, all those searched affirmatively signed a piece of paper acknowledging their consent. Neither factor, however, is dispositive.

Plaintiffs present substantial evidence that it was the custom and practice of CCSF officers to present a consent form to every arrestee who arrived at County Jail No. 9, regardless of whether there was reasonable suspicion that any individual arrestee may have been concealing contraband. The practice included an altered "Strip Search Authorization" form on which a "consent to search" line was added and that was presented to eligible arrestees immediately after booking and prior to classification. Plaintiffs allege that more

---

[10]Moreover, it is the government's burden to show that consent was voluntary. See Chan-Jimenez, 125 F.3d at 1327 ("In order to establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely given."). Yet even though defendants have not met their burden because they did not oppose plaintiff's motion, the Court must still analyze plaintiffs' claim in order to grant summary.

[11]Arrestees who were charged with crimes involving weapons, drugs or violence apparently were not asked for their consent to be searched under this custom. See Deposition of Stephanie Quock at 16:4-14. These arrestees, however, are not a part of the class here.

**United States District Court**

For the Northern District of California

than 4,000 arrestees signed a consent to search form.  Moreover, pursuant to this practice, if an arrestee did not consent to a search, he would ultimately be strip searched after being classified following booking.   Furthermore, plaintiffs proffer evidence that force was used if an arrestee refused to be strip searched.  See Deposition of Suzette Humphrey at 84:10-12.  In other words, plaintiffs argue that arrestees did not have a choice whether to be strip searched or not and therefore consent to a search could not be voluntary.

Yet the evidence in the record submitted by plaintiffs belies this contention.  See Deposition fo Eldred Oaks at 37:24-38:7 (noting that the custom included Sheriff's deputies "explaining to the individual that their charges were not strip-able" before asking them if they would agree to be strip searched).   Even assuming *arguendo* that this choice was "illusory," as plaintiffs contend, and that the arrestees would be strip searched regardless of whether they consented or not, it is not clear from the record if arrestees *knew* this when they consented to the search.  If they did not know that their choice was illusory, it is not clear that consent to a search under these circumstances was involuntary.  Moreover, although it may exist, there is no evidence currently before the Court that officers threatened the use of force at the time consent was requested or that arrestees were otherwise pressured into giving consent.  Consequently, the Court is unwilling to draw broad conclusions from a limited factual record when a fact-intensive inquiry is appropriate, particularly where even the limited evidence submitted indicates that at least some searches may have been voluntary.  The Court cannot say that, as a matter of law, that no consent to a search could have been voluntary under the circumstances.  Plaintiff's motion for summary judgment as to consent searches is therefore DENIED.

**F.    Safety Cell Searches**

Plaintiffs also challenge the Department's policy of automatically strip searching detainees on the sole basis that they have been designated for placement in a safety cell.  Detainees were placed in a safety cell if they fit into one of six categories:

1.  She/he displays bizarre behavior which results in the destruction of property.
2.  She/he displays bizarre behavior which reveals an intent to cause self-inflicted harm.
3.  She/he appears gravely disabled and less restrictive housing is unavailable.

18

**United States District Court**

For the Northern District of California

1        4.  She/he appears to be a danger to self or others.
         5.  She/he requests to use the safety cell.
2        6.  For observation only, if it is determined by direct observation that the prisoner has
             ingested items that may cause injury.
3
"Safety Cell Use" I.A.  From these classifications it appears that individuals were generally

4   placed in a safety cell, and therefore strip searched, if prison officials determined that the

5   individual appeared to be suffering from mental illness or was otherwise mentally unstable

6   such that there was a perceived risk that the detainee might engage in violent or self-

7   destructive conduct.  Plaintiffs contend that the categories themselves do not indicate

8   whether there is individualized suspicion to suspect that an arrestee is concealing contraband,

9   and therefore seek a ruling that the policy is unconstitutional on its face.

10       The Court first notes that the law on this subject is not clearly established.  Neither

11  party has found any case that discusses strip searches of pre-arraignment detainees based on

12  the determination that the individual is psychologically unstable.  Of course, such detainees

13  present unique and substantial safety concerns that prison officials should be free to address,

14  in part, by ensuring that the detainees are not hiding weapons or other contraband that may be

15  used to harm themselves or others.  Defendants here have presented evidence that mentally

16  unstable detainees in San Francisco's jail system have hidden contraband and have used such

17  contraband in attempts to harm themselves or others.  These findings are even more serious

18  in light of the Eighth Amendment obligations of jail managers to take reasonable precautions

19  to prevent prisoner suicide.  See Woodward v. Correctional Medical Services, 368 F.3d 917,

20  929 (7th Cir. 2004).

21       Standing against these valid safety concerns are the fundamental privacy interests that

22  are infringed by the extreme intrusiveness of a strip search.  These interests are no less

23  profound when the subject of the search is mentally disturbed.  See Aiken v. Nixon, 236

24  F.Supp.2d 211, 233 (N.D.N.Y. 2002) (discussing privacy interests in the context of strip

25  searches of individuals held in a psychiatric hospital).

26       The interests at stake in safety cell searches (prison safety and prisoner privacy) are

27  therefore identical to those considered in Giles and its progeny.  The Court therefore finds

28  that the Giles requirement of reasonable individualized suspicion that an arrestee is

**United States District Court**

For the Northern District of California

1    concealing contraband is the appropriate test for strip searches of pre-arraignment detainees

2    believed to be a danger to themselves or others.  See Aiken, 236 F.Supp.2d at 233-34

3    (adopting "reasonable suspicion" standard for strip searches of individuals who voluntarily

4    admitted themselves into a psychiatric hospital).  As articulated by Giles, important factors

5    include "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest

6    record." 746 F.2d at 617.  Of course, in this context, unlike the categorical searches upon

7    classification, the conduct of the arrestees is an important factor.  For example, conduct

8    indicating a detainee may be mentally disturbed in a manner that may lead to unpredictable

9    and potentially harmful conduct could serve as a valid justification for a search.  In addition,

10   the searches may be based on a suspicion that types of "contraband" not ordinarily believed

11   to be dangerous, such as shoelaces and other items used for self-strangulation, may be

12   hidden.  Nonetheless, the basic framework articulated in Giles remains the appropriate

13   analytical procedure to evaluate these claims.  That is, the mere fact of illustrating

14   characteristics of being mentally disturbed is not sufficient to justify a strip search.

15        Turning to the policy at issue, the constitutionality of a policy that requires that all

16   individuals placed in a safety cell be strip searched depends on the reasons for the safety cell

17   placement.  Under Giles, if the policy requires a reasonable individualized suspicion that the

18   detainee may be concealing drugs or other dangerous contraband, then the policy should be

19   upheld.  In the context of mentally unstable detainees, this Court finds that individualized

20   suspicion can be founded upon behavior or circumstances indicating that the detainee may be

21   a danger to himself or others.  Such behavior gives rise to legitimately heightened concerns

22   that the detainee could be concealing "contraband" that might be used for harmful purposes,

23   and thus serves as a reasonable basis for a strip search.  Moreover, to the extent that an

24   officer believes that an arrestee acting in a bizarre manner is under the influence of a

25   controlled substance, that amounts to individualized reasonable suspicion and that arrestee is

26   not a member of the class.

27        Here, some criteria identified by the policy at issue are reasonably related to this

28   security interest.  These are categories 2 ("bizarre behavior" and "intent to cause self-

20

United States District Court

For the Northern District of California

1  inflicted harm"); 4 ("danger to self or others"); and 6 ("ingested items that may cause

2  injury").  However, the other categories do not reveal a similar level of relatedness to the

3  interest in safety.  Category 1 ("bizarre behavior" and "destruction of property"), for

4  example, could be applied to an individual who has done nothing more than acted in a

5  "bizarre" fashion and caused disruption at the jail.  Category 3 ("gravely disabled" and

6  "housing unavailable") could easily be applied to a physically disabled person who for safety

7  reasons should not be placed in an ordinary cell.  Similarly, there is no requirement in

8  category 5 ("requests to use the safety cell") that an officer make an individualized

9  determination that the detainee raises safety concerns.  See Aiken, 236 F.Supp.2d at 233-34

10  (concluding that individuals who voluntarily admit themselves to a psychiatric ward do not

11  surrender all privacy protections and that strip searches of such admittees must be based on

12  reasonable suspicion of concealed drugs or weapons, but not other concealed items).

13      Plaintiffs would have this Court go further and declare all of the safety cell categories

14  to be so overbroad and vague as to be unconstitutional on their face.  Admittedly, none of the

15  categories are defined with objective terms that substantially constrain the individual

16  officer's discretion.  However, the process of identifying particular conduct that is indicative

17  of psychiatric disturbance which in turn signals a propensity for violent or self-destructive

18  conduct is inherently subjective and cannot be easily reduced to objective terms.  For this

19  reason, officers must be given considerable latitude in making this kind of determination.

20  Thus it was reasonable for the Department to craft a policy that leaves broad discretion with

21  the individual officer.

22      However, since such discretion is to be exercised by the individual officers, the Fourth

23  Amendment analysis must focus on the factors considered by those officers.  An individual

24  officer's subjective finding that a detainee was a danger to self or others, without any facts

25  articulated in support, is not enough to end the inquiry into whether a particular search was

26  constitutional.  Thus, although the Department's policy of allowing individual officers broad

27  discretion to determine which detainees pose a danger to themselves or others is not

28  unconstitutional on its face, plaintiffs may still prevail on their section 1983 claims by

showing that the individual officers exercised such discretion in an unconstitutional manner. For example, plaintiff Miki Mangosing was placed in a safety cell and strip searched pursuant to the determination that she was a danger to herself.  Records indicate that she was perceived to be under the influence, out of control and unable to remain in a sobering cell. Whether these and other facts support the responsible officers' conclusion that Mangosing was a risk to herself is a question to be resolved by the appropriate factfinder, but it is possible that the officer's conclusion was invalid even though the category itself is constitutional.

In summary, the Court finds that the Department's policy of strip searching all individuals placed in a safety cell, without regard for the reasons for the particular placement, is unconstitutional on its face.  Further, even with respect to searches conducted under the policy pursuant to the determination that a detainee is a danger to self or others, that determination is not enough by itself to justify a search.  In such cases, where a plaintiff can show that the individual officer had not conducted the search based on reasonable suspicion (i.e. where the officer was unreasonable in finding that the detainee was a danger to self or others) there may be liability pursuant to section 1983.  Accordingly, plaintiffs motion for summary judgment is GRANTED as to safety cell categories 1, 3, and 5 but DENIED as to safety cell categories 2, 4, and 6.

**III.    As-Applied Challenges by Individual Plaintiffs**

**A.    Plaintiffs Zern and Corneau**

In addition to their facial attack on the Department's policy as a whole, plaintiffs ask the Court to determine that plaintiffs Jonah Zern and Marcie Corneau are members of the class.  Specifically, plaintiffs challenge the argument that these two individuals were arrested on charges of violence.

Zern was charged with a violation of California Penal Code section 148.10, which describes the crime of:

> resist[ing] a peace officer in the discharge or attempt to discharge any duty of his or her office or employment and [where the] willful resistance proximately causes death or serious bodily injury to a peace officer

United States District Court

For the Northern District of California

1   See Kennedy, 901 F.2d at 705 (referring to statutory definition in the process of determining

2   whether a particular charge is a charge of violence).  Plaintiffs claim that this charge is not

3   sufficient to provide reasonable suspicion because the statute does not require that the

4   injuries to the officer result from force or violence.

5       The Ninth Circuit has held that "in some cases, the charge itself may give rise to

6   reasonable suspicion." Kennedy, 901 F.2d at 716 (citing Thompson 885 F.2d at 1447).  In

7   Thompson the Court held that the charge of grand theft auto provided reasonable suspicion

8   because that crime is "sufficiently associated with violence."  Thompson, 885 F.2d at 1447.

9   Similarly, although a violation of Penal Code section 148.10 does not necessarily involve

10  force or violence, the crime is sufficiently related to violent conduct that the charge by itself

11  justifies a strip search.

12      The same is true with respect to plaintiff Corneau.  She was arrested and charged

13  pursuant to California Penal Code section 243(e), which criminalizes a battery "committed

14  against a spouse. . . ."  Battery is defined under California law as "any willful and unlawful

15  use of force or violence upon the person of another."  Cal. Penal Code § 242.  Once again,

16  although plaintiffs may be correct that a violation of section 243(e) does not necessarily

17  involve violence, the crime is sufficiently associated with violent criminal conduct to justify

18  a strip search.

19      Therefore, plaintiffs Zern and Corneau are not members of the class.  Defendants have

20  renewed their earlier motion for summary judgment as to these plaintiffs.  Because the Court

21  finds that the searches conducted on these individuals was based on reasonable suspicion, the

22  motion is GRANTED.

23      **B.    Plaintiffs Bull, Mangosing and Timbrook**

24      The Ninth Circuit case law related to strip searches establishes that even where the

25  strip search policy is determined to be unconstitutional, a particular search may still be found

26  valid if the circumstances of the individual case created an individualized reasonable

27  suspicion.  Plaintiffs contend that there is no basis for concluding that there was a reasonable

28  suspicion as to plaintiffs Mary Bull, Miki Mangosing, and Laura Timbrook.  However,

**United States District Court**

For the Northern District of California

1  plaintiffs Bull and Mangosing were each searched pursuant to the Department's safety cell

2  policy.  The Court previously noted that these types of searches are deeply grounded in the

3  particular circumstances of the search and do not lend themselves easily to a broad brush

4  approach.  Moreover, there is substantial evidence in the record from which a reasonable

5  factfinder could conclude that both Bull and Mangosing were searched based on a reasonable

6  suspicion that they might harm themselves or others.  For example, an initial psychological

7  report regarding Bull states that she was "completely out of touch with reality," that "[s]he

8  murmurs and smiles to herself very inappropriately," that "she is not responding to contact,"

9  and that she "[a]t times seems to be talking to someone invisible."  A housing report

10 regarding Mangosing states that she was "out of control."  Accepting these accounts as true

11 and viewing them in the light most favorable to defendants, it is clear that summary judgment

12 should be DENIED as to whether reasonable suspicion existed to strip search these plaintiffs.

13     However, the Court reaches a different conclusion with respect to plaintiff Timbrook.

14 The record reveals that Timbrook was arrested pursuant to warrants for displaying a false

15 identification, possession of a forged check with intent to defraud and burglary.  After arrest,

16 Timbrook was classified for housing in the general jail population.  Defendant has not

17 opposed the motion for summary judgment in Timbrook's favor and the Court finds nothing

18 in the record that would support the conclusion that there was reasonable individualized

19 suspicion which supported the decision to strip search her.  As such, the motion is

20 GRANTED with respect to plaintiff Timbrook.

21 **IV.    Qualified Immunity**

22     Sheriff Michael Hennessey moves for partial summary judgment on his defense of

23 qualified immunity, claiming that the law discussed above was not sufficiently clearly

24 established at the time the policy was in effect and that he was reasonable in crafting it as he

25 did.

26     Qualified immunity protects "government officials . . . from liability for civil damages

27 insofar as their conduct does not violate clearly established statutory or constitutional rights

28 of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818

24

United States District Court

For the Northern District of California

(1982).  Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 206 (2001).  In considering a claim of qualified immunity, a court must first determine whether the plaintiffs have alleged the deprivation of an actual constitutional right.  See id. at 201.  If they have, the court must then determine whether that right was clearly established at the time of the violation.  See id.  The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id. at 202.  The clearly established test is met if "'in light of the pre-existing law the unlawfulness [is] apparent.'"  Galvin v. Hay, 361 F.3d 1134, 1139 (9th Cir. 2004) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  Even if an officer's actions violate a constitutional right, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.  Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir. 2003).

Here, Sheriff Hennessey is not protected by qualified immunity from a suit based on his decision to create a blanket policy of strip searching all individuals classified for housing in the general jail population.  As discussed above, the policy did violate plaintiffs' constitutional rights.  Moreover, the right was clearly established: in an unbroken line of precedent tracing back to 1984, the Ninth Circuit has reaffirmed the fundamental holding of Giles that a strip search of a pre-arraignment detainee must be supported by reasonable individualized suspicion.  It was also abundantly clear after Thompson that placement in the general jail population cannot "by itself cannot justify a strip search."  Thompson, 885 F.2d at 1447.  Given this clear precedent, the Court finds that reasonable minds could not differ as to what the law required.  The Sheriff's motion is therefore DENIED as to classification searches.

The legal landscape was far different as to safety cell strip searches.  At the time the policy was made there was little if any authority regarding searches of mentally ill or intoxicated detainees in a jail setting.  Although this Court finds that Giles provides substantial guidance regarding how this question should be addressed, that precedent does not necessarily compel the result reached here.  Accordingly, the law regarding safety cell

United States District Court

For the Northern District of California

1  searches was not clearly established and therefore Sheriff Hennessey's motion is GRANTED

2  on this issue.

3      Sheriff Hennessey's motion also is GRANTED with regard to the criminal history

4  category because the Court found there is no constitutional violation.  The Sheriff's motion is

5  further GRANTED with regard to probation searches, because even though the Court found

6  searches of probationers who did not consent to searches of their persons as conditions of

7  probation to be unconstitutional, the Sheriff could have reasonably thought that probationers'

8  reduced rights allowed them to be strip searched upon an arrest for a probation violation.

9  Moreover, there is no clearly established law in the Ninth Circuit to the contrary.

10      There is no clearly established law relating to searches of arrestees who were

11  transferred to or from other jurisdictions.  It is reasonable–and arguably wise–for the Sheriff

12  to operate with the utmost care when arrestees arrive at County Jail No. 9 from other

13  jurisdictions because of the possibility of pre-arranged contraband smuggling.  The Court is

14  particularly wary here of its "limited role" in judging the policy decisions law enforcement

15  personnel must make, and the Court further recognizes that some categorization is necessary

16  to effectively secure jails.  See Kennedy, 901 F.2d at 712 ("Corrections officials possess

17  special expertise in this area and must struggle regularly to maintain security in a most

18  difficult and potentially explosive setting.").  An individual analysis may ultimately reveal

19  that many of those arrestees never intermingled with the general jail population and arrived at

20  County Jail No. 9 immediately after their arrest, but the Sheriff's policy nevertheless was

21  reasonable in light of the absence of clearly established law and the significant responsibility

22  he possesses to protect the safety of the jails.  Therefore, the Court finds that the Sheriff's

23  motion is GRANTED as to arrestees who were transferred to or from other jurisdictions.

24      As to the remaining category–consent searches–any individual liability to the Sheriff

25  is derived only from his role as a supervisor to other officers who performed the consent

26  searches because those searches were not a part of his official policy and he did not conduct

27  any of the searches himself.  A supervisor generally "is only liable for constitutional

28  violations of his subordinates if the supervisor participated in or directed the violations, or

26

United States District Court

For the Northern District of California

1   knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040,

2   1045 (9th Cir. 1989).  Here, there is evidence in the record to support a finding that the

3   Sheriff did not know about the consent searches, and upon discovering this practice took

4   action to prevent the continued use of such searches.  See Memorandum from Captain

5   Richard Dyer, February 11, 2003.  Therefore, even though the Court can not determine

6   whether the consent searches were unconstitutional, the Sheriff would nevertheless not be

7   individually liable for the practice.  Accordingly, the Sheriff's motion for qualified immunity

8   with regard to the consent searches is GRANTED.

9   **V.    Monell Claims**

10      In their answer, defendants assert the affirmative defense that "[t]he complaint fails to

11  state a federal civil rights claim against the defendants under the doctrine announced in

12  Monell v. Department of Social Services, 436 U.S. 658 (1978)."  Plaintiffs move for

13  summary judgment that this defense is inapplicable.

14      In Monell, the Supreme Court held that if the "execution of a government's policy or

15  custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

16  represent official policy, inflicts the injury [then] the government as an entity is responsible

17  under § 1983."  Id. at 694.  To establish such municipal liability, a plaintiff must satisfy four

18  conditions: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived;

19  (2) that the municipality had a policy;  (3) that this policy 'amounts to deliberate indifference'

20  to the plaintiff's constitutional right;  and (4) that the policy is the 'moving force behind the

21  constitutional violation.'"  Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996)

22  (quoting Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir.1992) (citation omitted)).

23      It is clear that the Department's policy requiring strip searches of all individuals

24  classified for housing creates municipal liability under Monell.  Defendant has not contested

25  this was an official written policy of the CCSF.  Nor is there any dispute that the policy was

26  the "moving force" behind the constitutional violations.  The policy clearly required

27  individual officers to search all detainees classified for housing, without consideration of

28

1   individualized suspicion.  The CCSF is therefore liable under <u>Monell</u>.  As such, plaintiff's

2   motion for summary judgment on that issue is GRANTED.

3          Furthermore, to the extent probationers were unconstitutionally strip searched,

4   defendants present no evidence to dispute that it was done pursuant to the policy.  Likewise,

5   any strip searches executed pursuant to the policy relating to arrestees transferred to or from

6   other jurisdictions that are ultimately deemed unconstitutional would be motivated by the

7   policy, since defendants have presented no evidence that individual officers acted on their

8   own behalf rather than as directed by the policy.  Therefore, plaintiff's motion regarding

9   <u>Monell</u> liability is GRANTED as to these categories.

10          Plaintiffs acknowledge that the official written policy of the CCSF did not include

11   authorization for consent searches.  Nevertheless, plaintiffs contend that the consent searches

12   were a custom or informal policy that gives rise to <u>Monell</u> liability.  <u>See</u> <u>Monell</u>, 436 U.S. at

13   690-691 ("[L]ocal governments ... may be sued for constitutional deprivations visited

14   pursuant to governmental 'custom' even though such a custom has not received formal

15   approval through the body's official decision-making channels.").  The CCSF may be liable

16   if plaintiffs' injury results from a custom that is a "permanent and well-settled" practice.

17   <u>Thompson</u>, 885 F.2d at 1444.  <u>See also</u> <u>Gomez v. Vernon</u>, 255 F.3d 1118, 1127 (9th Cir.

18   2001) (condoning unconstitutional acts by the failure to investigate or correct the repeated

19   violations creates a policy or custom which permits the issuance of an injunction against the

20   administrators in their official capacity).  Once such a showing is made, a local government

21   may be liable for its custom "irrespective of whether official policymakers had actual

22   knowledge of the practice at issue."  <u>Thompson</u>, 885 F.2d at 1444.

23          Here, plaintiffs have submitted substantial evidence that it was the custom and

24   practice of the CCSF to ask all arrestees not charged with crimes involving violence, drugs or

25   weapons, to sign a form consented to be strip searched.  More than 4,000 arrestees signed

26   consent forms.  Moreover, a number of officers and supervisors of the City testified that

27   consent searches were the common practice at CCSF, at least until the CCSF took action to

28   end the practice by circulating a memorandum to that effect.  <u>See</u> Feb. 11 Dyer Memo.

United States District Court

For the Northern District of California

1  Therefore, the Court finds that the CCSF had a custom and practice of using consent searches

2  to strip search arrestees.  Although the Court cannot make a determination as to the

3  constitutionality of the consent searches here, the CCSF would be liable under Monell for

4  such searches, if any, that were unconstitutional and were conducted from the

5  commencement of the class period until February 11, 2003, when the memo was circulated.

6          Monell liability for the safety cell strip search policy presents a close question.

7  Plaintiffs have not presented evidence that the failure of the department to provide more

8  specific restrictions on safety cell strip searches was the "moving force" behind the alleged

9  violations of the detainees' constitutional rights.  Instead, plaintiffs claim that plaintiff Mary

10 Bull was subjected to a safety cell strip search because she refused to submit to a

11 "classification" strip search.  However, even accepting these allegations as true, such conduct

12 would amount to a violation of the Department's safety cell strip search policy and therefore

13 would not create municipal liability.  See Henry v. County of Shasta, 132 F.3d 512, 521 (9th

14 Cir. 1997) (suggesting that there is no Monell claim where the officers acted "in violation of

15 the orders or policies that governed their conduct").  Plaintiffs also contend that Miki

16 Mangosing was unconstitutionally strip searched after she was placed in a safety cell

17 pursuant to a finding that she was a danger to herself.  However, the constitutionality of such

18 a search would depend on whether the individual officers who chose to place her in a safety

19 cell had reasonable suspicion to believe that she was carrying concealed contraband.  It is

20 therefore clear that in each of these cases if the search involved was unconstitutional, the

21 proper defendant would be the individual officers who decided that the search should be

22 conducted.  Under these circumstances, it is not enough that the Department left substantial

23 discretion in the hands of the individual officers making safety cell placement

24 determinations.  In order for there to be municipal liability, plaintiffs must show that the

25 policy was a moving force behind the constitutional violations and that the Department's

26 decision not to further restrict officers' discretion to order safety cell searches amounted to

27 deliberate indifference on the part of the policymakers.  Plaintiffs' have not made such a

28 showing and therefore their motion for summary judgment on this issue is DENIED.

## VI.    Other Affirmative Defenses

Plaintiffs have also moved for summary judgment on defendants' affirmative defenses that the Sheriff is not a "person" liable under section 1983 and that the Sheriff is immune from exemplary and punitive damages.  Plaintiffs also ask for summary judgment with respect to the affirmative defenses of estoppel, assumption of risk, and comparative negligence.  Defendants have not opposed any of these motions and plaintiffs have satisfied their burden of proof in support of these motions; therefore, they are GRANTED.

## VII.   State Claims

Plaintiffs also move for summary judgment on their strip search claims under California Penal Code section 4030 and the California Constitution.

### A.    Penal Code Section 4030

California Penal Code Section 4030 makes unlawful and provides civil liability for certain classes of strip searches of pre-arraignment misdemeanor detainees. Defendants claim that insofar as some members of the class were strip searched after they were declared eligible for housing in the general jail population, such plaintiffs cannot state a claim for relief under section 4030.  The parties' dispute in this regard centers on two portions of section 4030.  Subdivision (f) of the statute provides in pertinent part:

> No person arrested and held in custody on a misdemeanor or infraction offense, except those involving weapons, controlled substances or violence . . . shall be subjected to a strip search or visual body cavity search *prior to placement in the general jail population*, unless a peace officer has determined there is reasonable suspicion based on specific and articulable facts to believe such person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband.

(emphasis added).

Subdivision (g) of section 4030 next provides that:

> [N]o person arrested and held in custody on a misdemeanor or infraction offense not involving weapons, controlled substances or violence, shall be confined in the general jail population unless all of the following are true: (i) The person is not cited and released[;] (ii) The person is not released on his or her own recognizance pursuant to Article 9 (commencing with Section 1318) of Chapter 1 of Title 10 of Part 2[;] (iii) The person is not

1    able to post bail within a reasonable time not less than three
     hours.

2          Relying on several statements in the legislative history, defendants take the position

3    that these two sections, when read together, allow a strip search to be performed *either* if

4    there is reasonable suspicion *or* if the three conditions of subdivision (g) are met.  For

5    example, prior to the passage of the bill that became section 4030, the legislative counsel

6    concluded that

7
             [u]nder the proposed Section 4030 of the Penal Code, a person
8            may be strip searched prior to the actual placement of the person
             in the general jail population, after the requirements of
9            subdivision (g) for that placement have been met, without the
             need for compliance with the requirements of subdivision (f).
10
     "Strip Searches--#5001" Letter to Honorable Marian Bergeson from Ben E. Dale (Feb. 27,
11
     1984) available at 6 Cal. Assembly Journal 11304 (1983-84 Reg. Sess.).  Statements in the
12
     legislative history by the Senate, Assembly and the Governor at the time of passage adopt the
13
     view of the legislative counsel, thus lending further support to defendants' interpretation.
14
           Plaintiffs respond with a citation to the later opinion of the California Attorney
15
     General, which concludes that section 4030 prohibits warrantless pre-arraignment strip
16
     searches absent reasonable suspicion "prior to the placement of [the detainee] in the general
17
     population."  See Cal. Att'y Gen. Opinion No. 88-1201 (July 6, 1989).
18
           The parties dispute arises out of the ambiguity of the phrase "prior to placement in the
19
     general jail population" that is used in subdivision (f) and repeated by the Attorney General's
20
     opinion.  The term "placement" in this phrase could reasonably be interpreted to refer either
21
     to the physical delivery of a detainee to the "general jail" structure, or any number of points
22
     in time before then, although after the subdivision (g) requirements are met.  It is an accepted
23
     principle of statutory interpretation that, given such ambiguity, reference to the legislative
24
     history is allowed.  See Day v. City of Fontana, 25 Cal.4th 268, 272 (Cal. 2001); see
25
     generally Stephen Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S.
26
     Cal. L. Rev. 845 (1992).  Here, the legislative history confirms that "placement" under the
27
     statute occurs at some time "prior to the *actual* placement of the person in the general jail
28
     population" (emphasis added), but at some point after the three prerequisites for jail

                                        31

confinement contained in subdivision (g) are met.  Thus the Court finds that section 4030 is not violated where a warrantless pre-arraignment strip search is performed without reasonable suspicion prior to a detainee physically arriving in the general jail population.

This, however, does not end the inquiry.  Some ambiguity remains regarding whether a search may be performed on any prearraignment detainee who satisfies the three conditions described in subdivision (g).  Defendant claims that these three factors are sufficient to justify a search under the statute.  The Court rejects this view.  If defendants were correct, the statute would be reduced to nothing more than a three-hour waiting period for strip searches of any arrestee who is not able to post bail.  This is true because the nonoccurrence of the events described in subdivisions (g)(1) and (g)(2) is entirely within the control of the detaining officials.  Nothing in the legislative history requires such a sweeping result, and the clear text of the statute counsels against it.  The legislative counsel's opinion states only that searches may be conducted "prior to . . . actual placement."  This reasonable statement cannot be converted into the sweeping conclusion that satisfaction of the subdivision (g) factors alone is both necessary *and* sufficient to justify a search without reasonable suspicion. That view is contrary to the express intent of the statute to protect detainees' civil rights by limiting strip searches.  See Cal. Penal Code § 4030(a) ("It is the intent of the Legislature in enacting this section to protect the state and federal constitutional rights of the people of California . . . by strictly limiting strip and body cavity searches.").  Rather than adopting this radical view,[12] the Court instead finds that a search without reasonable suspicion may take place consistent with section 4030 after: (1) the three subdivision (g) conditions are met; and (2) the circumstances demonstrate that the individual detainee is actually destined for the general jail population absent some unexpected reason for release.

---

[12]The Court also rejects plaintiffs' view that subdivision (g) prohibits incorporation of an inmate into the general jail population prior to an O.R. hearing.  The clear text of the statute is to the contrary and requires only that the detainee "is not released on his or her own recognizance pursuant to" Penal Code section 1318 et seq., which governs O.R. releases.  This language clearly requires only the nonoccurrence of an O.R. release, and creates no substantive rights to a hearing prior to housing in the general jail population.

1    Here, defendants have asserted that detainees assigned for housing were not strip

2    searched until detainees were to be "dressed in" attire appropriate for the general jail

3    population.  Confirming this fact, after removing their own clothes and being strip searched,

4    inmates were instructed to put on prison uniforms.  Assuming these facts are true, searches

5    under these circumstances did not run afoul of section 4030.  Therefore, plaintiff's motion

6    for summary judgment as to section 4030 is DENIED.

7        **B.     State Law Immunities**

8        Defendants next claim that the city is immune from liability under section 4030

9    because California Government Code section 844.6[13] provides immunity for public entities

10   from suits brought by prisoners.  However, section 4030 was enacted several years after

11   section 844.6 and explicitly provides a private right of action for any detainee aggrieved by a

12   violation of the state.  See Cal. Penal Code § 4030(p).  Of course, there are only two classes

13   of conceivable defendants in the civil suits contemplated by this private right of action:

14   public entities making strip search policies and individual officers executing such policies.

15   Thus to find that the earlier-enacted immunity prevails over the later-enacted cause of action

16   would be to nullify at least half of the potential scope of the private cause of action.

17   However, the later statute is more specific and does not limit the suits to either of these

18   classes of defendants.  The Court therefore concludes that immunity on these grounds does

19   not apply.

20       Defendants' similar claim that Sheriff Hennessey is immune from liability under

21   California Government Code section 820.2[14] also fails.  That statute opens with the

22   qualification that it applies "[e]xcept as otherwise provided by statute."  Cal. Gov't Code §

23

24       [13]The statute states: "(a) Notwithstanding any other provision of this part, except as
     provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1
25   (commencing with Section 3500) of Part 3 of the Penal Code, a public entity is not liable for:
     . . . (2) An injury to any prisoner."  Cal. Gov't Code § 844.6.
26

27       [14]The statute states: "Except as otherwise provided by statute, a public employee is not
     liable for an injury resulting from his act or omission where the act or omission was the result
28   of the exercise of the discretion vested in him, whether or not such discretion be abused."  Cal.
     Gov't Code § 820.2.

United States District Court

For the Northern District of California

820.2.  As before, the more recent authorization of suit in section 4030 falls squarely within the statutory exception in section 820.2.  Therefore no immunity applies.

**C.      State Constitutional Claims**

Defendants claim that plaintiffs' cause of action brought under the California Constitution's privacy clause also fail.  Defendants state that in this context the California constitution's privacy protection should be interpreted consistent with federal interpretations of Fourth Amendment protection.  See In re York, 9 Cal. 4th 1133, 1149 (1995).  Since the Court has rejected the claim that blanket strip searches of all detainees entering the general jail population is consistent with the Fourth Amendment, the same argument must also be rejected here.  Further, defendant has cited no case in which the statutory immunity created by Government Code section 844.6 was interpreted to be an available defense against a claim brought under the California Constitution's privacy clause.

**D.      Other Defenses**

Plaintiffs also moved for summary judgment with regard to several other of plaintiffs' affirmative defenses: that plaintiffs failed to satisfy claim presentment requirements; that defendants are immune as public employees engaged in the execution and enforcement of law under Government Code section 820.4; and that defendants are immune as third parties under Government Code section 820.8.  Defendants have not opposed these motions and they are therefore GRANTED.

//
//
//
//
//
//
//
//
//

34

**United States District Court**

For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court rules as follows:

1.  Plaintiffs' motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

2.  Defendant Sheriff Hennessey's motion for summary judgment regarding qualified immunity is GRANTED IN PART and DENIED IN PART.

3.  Defendants' motion for summary judgment regarding plaintiffs Zern and Corneau is GRANTED.

**IT IS SO ORDERED.**

Dated: February 23, 2006

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE